**T.I.M.E.—DC, INC., Plaintiff,**

v.

**TRUCKING EMPLOYEES OF NORTH JERSEY WELFARE FUND, INC., Defendant.**

**No. 82 CIV 3212.**

United States District Court,
E.D. New York.

March 9, 1983.

---

Proskauer, Rose, Goetz & Mendelsohn, New York City, Kirkland & Ellis, Washington, D.C., for plaintiff; Bettina B. Plevan, New York City, Carl L. Taylor, Donald E. Scott, Washington, D.C., of counsel.

Cohen, Weiss & Simon, New York City, Schneider, Cohen, Solomon & DiMarzio, Jersey City, N.J., for defendant; Richard Seltzer, New York City, Paul A. Friedman, Jersey City, N.J., of counsel.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This motion for a preliminary injunction presents an interesting question of statutory interpretation under the Multiemployer Pension Plan Amendments Act ("MPPAA") of 1980. Plaintiff T.I.M.E.–DC, Inc. ("TIME–DC") seeks to enjoin defendant Trucking Employees of North Jersey Welfare Fund, Inc. ("Fund") from asserting withdrawal liability in excess of $373,000 against it. TIME–DC claims that the statutory labor dispute exception, 29 U.S.C. § 1398(2), relieves it of the obligation to remit the withdrawal liability payments. For the reasons developed below, I agree. Accordingly, defendant is enjoined from enforcing withdrawal liability payments against TIME–DC.

## FACTS

I. *The Parties*

A. *TIME–DC*

TIME–DC is an interstate trucking company that transports general commodities throughout the United States. It has operated under union contracts with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "Teamsters" or the "union"). For many years, TIME–DC signed the national master contracts negotiated between the Teamsters and a national carrier association called Trucking Management, Inc. ("TMI"). TIME–DC's latest contract with the Teamsters was the National Freight Agreement covering the period of April 1, 1979 to March 31, 1982.

During 1980–81, however, principally because of increased competition from nonunion firms, TIME–DC's business position deteriorated. Governmental deregulation of the trucking industry had allowed these

firms to enter the market. Therefore, TIME–DC withdrew from TMI's multiemployer bargaining with the Teamsters in September, 1981. Plaintiff wished to negotiate a separate contract that would enable it to compete more effectively with non-union carriers. The negotiations were not successful, however, and the Teamsters struck TIME–DC nationwide at midnight on March 31, 1982. The strike, reinforced by picketing, closed TIME–DC's terminals throughout the United States.

## B. THE FUND

The Fund is a pension plan that receives contributions on behalf of members of Local 560 of the Teamsters who are employed by companies having collective bargaining agreements with Local 560. The jurisdiction of Local 560 includes Brooklyn, New York.

TIME–DC has made pension contributions to the Fund, as well as to twenty-five other Teamster-member funds. The Fund is a corporation operated by a Board of Trustees, and is a multiemployer plan within the meaning of the MPPAA of 1980, 29 U.S.C. §§ 1381–1405 (Supp.1982).

The Board of Trustees of the Fund includes representatives of both management and labor. During 1982, the union members of the Fund were: Salvatore Provenzano, President and Chief Executive of Local 560;[1] Joseph Sheridan, Vice-President of Local 560;[2] and Thomas Reynolds, Trustee of Local 560. On the management side were: Clifford D. Finkle, Jr., of Passaic Terminal and Transportation Co.; Harold Hackett of Hackett Trucking; Clarence Frankel of Cooper Jarrett (Fund member until October 1, 1982); and Raymond Kein of Helms Express (Fund member since October 1, 1982).

Marvin Zalk, the Administrator of the Fund, is responsible for the collection of payments to the Fund, for keeping the Trustees apprised of developments concerning the Fund, and for calling meetings of the Trustees. In short, he is charged with the day-to-day responsibilities of the Fund.

## II. *Withdrawal Liability Under The MPPAA*

Pension plans in the trucking industry are administered under the collective bargaining contract as multiemployer plans. Under the contract, each employer contributes on a formula basis according to the hours worked by its union employees. As a result of the mandatory vesting requirements of the federal Employee Retirement Income Security Act ("ERISA") of 1974, and of the benefit increases declared by pension plan trustees, the pension plans have built up large vested unfunded liabilities to their beneficiaries over the past decade.

The MPPAA of 1980 created non-contractual liability for employers who withdraw from multiemployer plans. That liability represents a share of the pension plans' total vested unfunded liability, and is not necessarily related to the way in which the liability arose. Thus, because an employer may incur liability for the pensions of other employers' workers, withdrawal liability works as a penalty on an employer who withdraws from the plan.

The Eastern Conference of Teamsters sent an electronic mailgram to Provenzano, President of Local 560, during the afternoon of March 31, 1982. That communication instructed Local 560 to strike TIME–

---

1. Provenzano is also the Teamsters' National Vice-President for the New Jersey area and the Secretary-Treasurer of the Eastern Conference of Teamsters. Provenzano Deposition at 5–6. He served on the Teamsters National Freight Negotiating Committee during the latest round of contract negotiations, and had a direct role in designing the current National Master Freight Agreement. *Id.* at 7–8.

2. Jaronko is the union officer responsible for directing the pickets and other strike activities against TIME–DC since March, 1982. *Id.* at 11–12; Jaronko Deposition at 16. Jaronko also is a member of the Eastern Conference of Teamsters. The Eastern Conference Committee was responsible for negotiating job conditions for union members who work in New York or New Jersey and whose employers sign the National Master Freight Agreement with the Teamsters. Jaronko Deposition at 10–11.

DC as of 12:01 A.M., April 1. The mailgram indicated that Local 560's members should picket TIME–DC with signs reading "TIME–DC UNFAIR, TEAMSTERS LOCAL UNION No. _____." Plaintiff's Exhibit 18; Provenzano Deposition at 11; Jaronko Deposition at 15–16.

Local 560 complied with these instructions. Jaronko, the business agent for Local 560, instituted strike activities against TIME–DC. He directed the shop steward to picket the Brooklyn terminal beginning early April 1, 1982. Jaronko Deposition at 16–17. No freight crossed the picket line after April 1, nor did truckers cross the line. *Id.* at 17–18. The strike shut down TIME–DC's Brooklyn operation. Provenzano Deposition at 13–14; Zalk Deposition at 88–89.

At that point, Jaronko may have believed that TIME–DC was terminating its Brooklyn operation, because sometime in March he had been informed by the shop steward, Mr. Sal Mustaccio, that equipment and furniture were being moved out of the terminal, and that the telephones were being disconnected.[3]

TIME–DC does not dispute that the Brooklyn terminal was cleared out. It also concedes that it allowed the lease on the terminal to expire in May, 1982. The parties are poles apart, however, as to the significance of these actions. In discussing the matter with Zalk (the Fund Administrator), Jaronko indicated that TIME–DC had "closed its doors" and terminated its business. Zalk Deposition at 25. Zalk was told that TIME–DC "had closed permanently." *Id.* at 27. He was not told about the strike, or about the pickets. *Id.* at 30–31, 46–47, 63, 70.

William Williamson, Senior Vice-President of Operations for TIME–DC, gave a different interpretation to these events at the preliminary injunction hearing held before this Court on January 3, 1982. Williamson stated that he had discovered,

through messages and telephone calls received on March 30 and 31, that plaintiff was to be struck, nationwide, at midnight on March 31. Accordingly, on March 31, he instructed TIME–DC's nationwide management personnel to implement a strike plan that had been disseminated approximately one month earlier. Transcript of January 3 Preliminary Injunction Hearing at 41–42. That plan provided for emptying as much freight as possible from all terminals before the beginning of the strike because of the Interstate Commerce Commission rule that a company "deliver that freight that is in [one's] possession." *Id.* at 43. Further, the strike plan called for the consolidation of TIME–DC's equipment from eighty-five to eighteen locations. Williamson cited security reasons for the consolidation: it is simpler, as well as cheaper, to secure eighteen facilities than it is to secure eighty-five. Finally, the decision to allow the terminal's lease to expire was also deemed a cost-saving measure. Williamson stated that, owing to the depressed nature of the industry, there were terminals "available for lease upon a moment's notice." *Id.* at 46.

In any event, it is undisputed that Zalk based his next move solely upon Jaronko's statement. On April 26, Zalk sent TIME–DC a letter asserting withdrawal liability under the MPPAA. Zalk Deposition at 42. That letter stated: "The Multiemployer Pension Plans Amendment Act of 1980 imposes a liability on employers who cease contributing to a pension plan after April 28, 1980. Our records indicate that you withdrew from this Fund on April 8, 1982." Plaintiff's Exhibit 2.

Zalk has conceded, however, that the only Fund "records" he had when he sent the April 26th letter were TIME–DC's contribution records through March 1982. Zalk Deposition at 53. These records showed normal work levels at TIME–DC's Brooklyn terminal. *Id.* at 54. No Fund "records" indicated that TIME–DC had shut down or

---

**3.** This information is obtained from Jaronko's deposition at 20–22. At the preliminary injunction hearing, the parties stipulated that this material was being offered for the limited pur-

pose of demonstrating Jaronko's state of mind. Transcript of Hearing for Preliminary Injunction at 64.

stopped contributing to the Fund. As of April 26th, Zalk admits, his conclusions were based solely on Jaronko's assertion that TIME–DC had permanently closed. *Id.* at 46.

Zalk did not communicate with TIME–DC to determine the true circumstances of the shutdown, *Id.* at 27, nor did he discuss his action against TIME–DC with any Trustee (except for Jaronko). *Id.* at 31–32. Having received no response to the letter of April 26, Zalk sent TIME–DC another letter on May 19, demanding payment of withdrawal liability totaling $373,628. Plaintiff's Exhibit 4. Again, Zalk based his action solely upon information obtained from Jaronko. *Id.* at 66–67. Zalk did learn of the Teamsters strike when he received a letter, dated May 25, from TIME–DC's Financial Vice-President, Eugene K. Anderson, protesting the Fund's assertion of withdrawal liability during a labor dispute. Plaintiff's Exhibit 8; Zalk Deposition at 71–72. Zalk responded by concluding that a "legal question" was involved, and by referring the matter to counsel. Zalk Deposition at 72–76.

The conclusion is inescapable that the Local 560 Fund launched its withdrawal liability claim against TIME–DC based solely on Jaronko's word. He failed to inform the Fund Administrator about the strike and the picketing that had actually shut down TIME–DC's terminal. The Fund's action was thus induced by misinformation and nondisclosure by the union; and the Fund itself made no attempt to verify the facts.

The record indicates that the Trustees were not aware of the circumstances surrounding plaintiff's cessation of contributions. Apparently, Zalk never informed the Trustees that TIME–DC was asserting that its contributions were excused because of the on-going strike. Indeed, the Trustees had not heard of the "labor dispute" exception to the MPPAA before their prepara-

tions for testimony. Frankel Deposition at 21–22; Sheridan Deposition at 35–36; Jaronko Deposition at 33; Hackett Deposition at 21–22; Finkle Deposition at 13–14. Two of the Trustees did not even know about the strike before their depositions. Sheridan Deposition at 16–17; Hackett Deposition at 17. It is not surprising, therefore, that the Trustees never questioned Zalk concerning the assertion of withdrawal liability against TIME–DC. The Board met on May 11 and on September 14, but the TIME–DC situation was not separately discussed. Zalk Deposition at 91, 93; Provenzano Deposition at 26, 27; Frankel Deposition at 17–18; Finkle Deposition at 9–11; Hackett Deposition at 11–12, 18–19.

Ignoring TIME–DC's letter of May 25 which challenged the claim for withdrawal liability during a labor dispute, Zalk Deposition at 79–80, Zalk sent the company a "delinquency" form letter on July 23.[4] Plaintiff's Exhibit 9. On July 27, counsel for the Fund sent a demand for arbitration against TIME–DC to the New Jersey State Board of Mediation. Plaintiff's Exhibit 10.

Zalk admits that the arbitration demand was made without examining any of the particular facts about TIME–DC's management during the shutdown. At that point, however, Zalk was acting on the advice of Counsel, who informed him that TIME–DC's assertion of the labor dispute exception was within the coverage of disputes amenable to arbitration. 29 U.S.C. § 1401(a)(1).

On July 29, 1982, counsel for TIME–DC contacted counsel for the Fund regarding the withdrawal liability demand, and obtained an agreement by the Fund to extend the date for commencement of the withdrawal liability payment until September 1, 1982. The stated purpose of the extension was to afford TIME–DC sufficient opportunity to submit documents to persuade the Fund that its demand for

---

**4.** The Trustees remained unaware of this correspondence at the time of their depositions.

Frankel Deposition at 25; Sheridan Deposition

withdrawal liability had been premature.[5] Zalk Affidavit at 13.

On August 2, TIME–DC sent extensive papers concerning the strike and the MPPAA exception to the Fund's counsel. Plaintiff's Exhibit 12. On August 24, TIME–DC again wrote to the Fund's counsel to confirm that the company's pension contributions had not stopped before the strike. Plaintiff's Exhibit 13. The Trustees admit that they never saw or heard of these communications. Frankel Deposition at 21; Sheridan Deposition at 32–33; Finkle Deposition at 12; Hackett Deposition at 24–25; Jaronko Deposition at 31; Provenzano Deposition at 26–27.

Finally, on September 23, TIME–DC sent the Fund's counsel a letter stating that: the Brooklyn terminal had been closed by the strike, and for no other reason; TIME–DC did not intend to permanently cease operations there; and, when the strike ended, TIME–DC "would resume such operations as it [would be] able..." Plaintiff's Exhibit 14.

What was done with this letter is in dispute. Defendants claim that the "communication was subsequently presented to the Trustees of the Fund by Fund counsel. The letter was interpreted by the Trustees as meaning that TIME–DC was shutting down its operations in Brooklyn." Defend-

ant's Proposed Findings of Fact, para. 23. This assertion is incredible, because each of the Trustees testified that he neither saw nor heard of TIME–DC's assurance that it intended to reopen when the strike ended. Provenzano Deposition at 37; Jaronko Deposition at 31; Sheridan Deposition at 32; Frankel Deposition at 25–26; Hackett Deposition at 24–25; Finkle Deposition at 12. Indeed, Provenzano admitted that this assurance is something he might have considered in making his decision as a Trustee. Provenzano Deposition, 37–38. Two of the Trustees, Provenzano and Jaronko, claim that the Fund's counsel told them instead, at the November meeting, that there was a document from TIME–DC saying that the company was shutting down. Provenzano Deposition at 32–33; Jaronko Deposition at 30. No such document has been shown to exist.[6]

In sum, even assuming that TIME–DC's actions demonstrated an apparent intention to shut down permanently in Local 560's jurisdiction, the Teamsters and the Fund could have determined why TIME–DC moved its freight and equipment out of the Brooklyn terminal. Instead, the Fund simply accepted the union's characterization of the company's plans during a time of strike hostility.

---

at 32–33; Jaronko Deposition at 31; Hackett Deposition at 24; Finkle Deposition at 12.

5. The date for commencement of withdrawal liability payments has subsequently been extended several times. The current extension, now mooted, was to have expired on March 4, 1983.

6. The lack of information imparted to the Trustees during this entire sequence of events is astonishing. For example, the Trustees were never told about the "labor dispute" exception to withdrawal liability. Frankel Deposition at 21–22; Sheridan Deposition at 35–36; Jaronko Deposition at 33; Hackett Deposition at 21–22; Finkle Deposition at 13–14. As Trustee Sheridan stated: "I don't know what [the] responsibilities would be under that [provision.]" Sheridan Deposition at 34. Three of the Trustees did not know that the Teamsters had ever struck TIME–DC. Sheridan Deposition at 16–17; Finkle Deposition at 14–15; Hackett Deposition at 17.

Trustee Hackett testified that Mr. Eddie Cohen —"the lawyer for the Teamsters," Hackett Deposition at 14, told the Trustees that TIME–DC's Brooklyn "terminal was completely closed, that TIME–DC closed it. The labor union didn't pull [plaintiff] out on strike." *Id.* at 15. Cohen advised the Trustees that plaintiff was taking the position that the union was on strike, but the Trustees accepted Cohen's statement that "they are not on strike." *Id.* at 15.

The union's own conduct contradicts Cohen's position, accepted by the Trustees, that the union did not pull plaintiff out on strike. Provenzano and Jaronko admit that Local 560 has continued to claim and receive strike benefits. Provenzano Deposition at 44–45; Jaronko Deposition at 32; Plaintiff's Exhibits 19, 21, 24. The union's conduct therefore reflects its perception that the strike is continuing—not that TIME–DC has voluntarily or permanently closed its operations within the jurisdiction of Local 560.

### LAW

■ Plaintiff advances two principal theories. First, it contends that the labor dispute exception to the MPPAA, 29 U.S.C. § 1398, applies, and that the Fund's assertion of withdrawal liability is therefore improper. Second, it argues that the Fund and the union acted collusively, thereby violating section 1 of the Sherman Act, 15 U.S.C. § 1.[7]

In response to plaintiff's first argument, defendant relies on 29 U.S.C. § 1401:

> (a)(1) Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration.

Defendant maintains that the question whether the labor dispute exception applies to this case should be addressed, in the first instance, by an arbitrator. As to the Sherman Act argument, defendant contends, in substance, that the factual record simply fails to reveal conduct proscribed by that statute.

Because I hold that the disposition of this motion is governed by the MPPAA, I need not reach the antitrust issue. As will become apparent, however, several of the facts undergirding the Sherman Act claim are also relevant to plaintiff's MPPAA argument.

### I. The Labor Dispute Exception to Assertion of Withdrawal Liability Under The MPPAA

The MPPAA provides that no pension fund shall assert withdrawal liability against a company that suspends contributions solely because of an ongoing labor dispute. The labor dispute exception to the withdrawal liability penalty is set forth at 29 U.S.C. § 1398:

> Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—... (2) an employer suspends contributions under the plan during a labor dispute involving its employees.

In this case, two closely related issues are presented: (1) as a threshold question, should the applicability of this section be decided by an arbitrator, or by this Court?; and (2) if the Court is the proper forum, does the statutory exception preclude the assertion of withdrawal liability in this case? I hold that this question is properly before me, and that the labor dispute exception does apply.

### II. The Doctrine of Exhaustion of Administrative Remedies

■ Defendant emphasizes the general rule that "[w]here Congress has clearly commanded that administrative judgment be taken initially or exclusively, the Courts have no lawful function to anticipate the administrative decision with their own ...." *Aircraft and Diesel Equipment Corp. v. Hirsh,* 331 U.S. 752, 767, 67 S.Ct. 1493, 1500, 91 L.Ed. 1796 (1947). Exhaustion of prescribed administrative remedies must generally precede resort to the federal judiciary. *Myers v. Bethlehem Ship Building Co.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638 (1938). At least one District Court has held that this doctrine also applies to the MPPAA:

> [T]he Court must consider the fact that Congress when it created the statutory scheme encompassing ERISA and the [Multi-employer Act] deemed arbitration as the proper forum for the adjudication of claims arising out of this scheme. We cannot blithely ignore the express intent of Congress. Arbitration, as the statutorily established forum, should be resorted to first ....

*Tenson Co. v. PBGC, slip op.* at 8 (N.D. Ill., April 22, 1982).

---

7. Plaintiff also suggests that the MPPAA is unconstitutional. As plaintiff itself concedes, however, this motion may be decided upon statutory grounds (under the MPPAA); therefore, it is unnecessary to reach the constitutional claim. Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction at 7, n. 3. *See Babcock & Wilcox Co. v. Marshall,* 610 F.2d 1128, 1137 (3d Cir.1979).

Although the parties have not addressed the issue, I note that an argument might be made that, because the MPPAA calls for a determination by a private arbitrator—as opposed to an administrative agency—the exhaustion doctrine is inapplicable. For reasons with which I am in substantial agreement, the Third Circuit has rejected the identical argument in *Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 294, 295 (3d Cir.1982):

> [C]ongress, in enacting MPPAA, expressed a clear preference for self-regulation through arbitration, 29 U.S.C. § 1401(a)(1); provided for judicial review in the event that arbitration failed to resolve the controversy, *id.* § 1401(b)(2); and established an elaborate procedural framework to guide the arbitrator, *id.* §§ 1381–1461. Thus, in accordance with the exhaustion doctrine's policy of deference to Congress, the legislature's decision that arbitration, and not the courts, is the proper forum for the initial resolution of disputes should be respected.

> Application of the exhaustion doctrine to arbitration proceedings also [promotes] the autonomy of the arbitration process ... by forbidding the interruption of that tribunal's proceedings until it has exercised its discretion and applied its expertise. In addition, arbitration can further the goals of judicial economy and judicial restraint either by resolving a complaining party's grievance, ... or by making factual findings that must precede appellate review. *See Aircraft & Diesel Corp. [v. Hirsch],* 331 U.S. [752] at 767 [67 S.Ct. 1493 at 1500, 91 L.Ed. 1796]; *Ashwander [v. Tennessee Valley Authority],* 297 U.S. [288] at 347 [56 S.Ct. 466 at 483, 80 L.Ed. 688] (Brandeis, J., concurring).

[F]inally, since MPPAA allows the parties to select the arbitrator, it is unreasonable to assume that they will select one ignorant of the relevant issues.

 It is equally well-recognized, however, that the exhaustion doctrine admits of several exceptions: (1) exhaustion is not required "when the nonjudicial remedy is clearly shown to be inadequate to prevent irreparable injury," *Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 293 (3d Cir., 1982); (2) the doctrine is inapplicable "when the issues presented to the court revolve around statutory interpretation," *Touche Ross & Co. v. SEC,* 609 F.2d 570, 576–77 (2d Cir.1979); *Colorado v. Veterans Administration,* 430 F.Supp. 551, 558 (D.Colo.1977); (3) an antitrust claim is not arbitrable, *American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821, 828 (2d Cir. 1968); and (4) constitutional questions must be answered by the courts, not by administrative agencies or by arbitrators, *Republic Industries, supra,* at 296. These exceptions reflect an underlying perception that arbitrators and administrative agencies need not be resorted to when there is "no need for agency expertise or the exercise of agency discretion." *Touche Ross & Co. v. SEC,* 609 F.2d 570, 577 (2d Cir.1979).[8]

 Focusing on the statutory interpretation exception ((2) *supra* ), it is clear that this case is one in which the arbitral process would serve no useful function. The central facts are not in dispute: Administrator Zalk's initial demand for withdrawal liability payments was made without the benefit of information from TIME–DC, and the Fund was also ignorant of the facts when it asserted withdrawal liability. 298–299,

---

**8.** Plaintiff also raises the threshold argument that the arbitration section of the MPPAA may not even be applicable to controversies concerning the "labor dispute" exception. The syllogism runs as follows: (1) the arbitration section speaks of "[a]ny dispute ... concerning a *determination* made under this title" (emphasis added); (2) the statute uses the term "determination" in reference to actuarial and arithmetic questions; (3) therefore, the MPPAA contemplates arbitration solely as a procedure for reviewing a Fund's computation of withdrawal liability.

The use of the term "determination" in the arbitration section is, concededly, confusing. In no section of the MPPAA, however, is the term defined. Accordingly, I am persuaded that "determination" is susceptible of a reading sufficiently broad to cover the present situation.

*supra.* The disposition of this motion, therefore, hinges on the general question of the applicability of the statutory labor dispute exception in situations similar to this one. Arbitration is not the proper forum for determination of this issue, because what is required is statutory interpretation. *See Republic Industries, supra,* 693 F.2d at 297–298 (3d Cir., 1982); *Touche Ross, supra,* 609 F.2d at 577; *Consumers Union v. Cost of Living Council,* 491 F.2d 1396, 1399 (Temp.Emer.Ct.App.), *cert. denied,* 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974). Accordingly, I now turn to the merits of the labor exception dispute.

III. *The Applicability of the Labor Dispute Exception To This Case*

██ There is no need for a lengthy reiteration of what the factual record makes obvious. It suffices to note that neither Zalk nor the Trustees inquired into the circumstances of TIME–DC's cessation of contributions before asserting withdrawal liability. The question, thus, is: when an employer and a union are locked in a labor dispute, may withdrawal liability be asserted based solely upon unsupported allegations that the employer has permanently ceased operations? This is apparently a question of first impression.

I find that a Fund that seeks to assert withdrawal liability against an employer claiming to fit within the labor dispute exception has, at minimum, a duty to undertake an inquiry of the factual circumstances. This rule is derived from the long-established requirement that pension funds act independently of the interests of both management and labor. *See* 29 U.S.C. § 186; *Arroyo v. United States,* 359 U.S. 419, 426, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959); *Robbins v. Prosser's Moving and Storage Co.,* 93 Lab.Cas. CCH para. 13,401 (8th Cir.), *rehearing granted,* 700 F.2d 433, 8th Cir., 1982; *Cf.* House Comm. on Education and Labor, the MPPAA of 1979, H.R. Rep. 869, Part 1, 96th Cong., 2d Sess. 51, 63

(1980), U.S.Code Cong. & Admin.News 1980, pp. 2918, 2931 (it is important "to preserve . . . the integrity of the collective bargaining process.").

A reasonable inquiry prior to the assertion of withdrawal liability would blunt any inference that the union and the fund were acting collusively.[9] In this case, Mr. Williamson testified at the hearing that TIME–DC had not ceased operations. Tr. at 41–46. Adherence to principles of fiduciary duty required the Fund to seek out just this sort of information before reaching a determination. *See Toensing v. Brown,* 528 F.2d 69, 72 (9th Cir.1975); *Lee v. Nesbitt,* 453 F.2d 1309, 1311 (9th Cir.1971). Because several of the Fund members were unaware even that a strike was in progress at the time that Administrator Zalk determined to assert liability, the Fund has acted prematurely. At this point, it may not impose withdrawal liability against TIME–DC. Once the Fund has considered the information presented by both sides, it may—indeed, it must—decide whether an assertion of withdrawal liability is warranted. I express no opinion at this time as to whether the assertion would then be upheld.

██ Defendant makes the further argument that, even assuming that a labor dispute had existed at one time, the dispute has ended, because the Teamsters have agreed to return to work for TIME–DC. The dispute has not been resolved, however, because there is still no contract between TIME–DC and the Teamsters resolving the controversy. 29 U.S.C. § 152(9) defines "labor dispute" broadly, to include "any controversy concerning terms, tenure, or conditions of employment . . . ." The labor dispute thus continues, and the defendant's argument is unpersuasive.

IV. *The Request for a Preliminary Injunction*

The requirements for issuance of a preliminary injunction in this Circuit are clear.

---

**9.** Again, I do not decide the issue whether, in fact, the Fund and the Union were acting collusively. The point is that an investigation of the circumstances would tend to negate any such inference and to properly discharge the fiduciary duties of the Trustees. *See* 29 U.S.C. § 1104 (a)(1).

**304**

For an injunction to issue, the movant must show:

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Standard & Poor's Corp. v. Commodity Exchange, Inc.,* 683 F.2d 704, 707 (2d Cir.1982); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

▮▮▮▮▮ In addition, although "not explicitly mentioned" in this Circuit, the public interest may be considered in deciding whether to issue the injunction. *Standard & Poor's, supra,* 683 F.2d at 711; *Brown & Williamson Tobacco Corp. v. Engman,* 527 F.2d 1115, 1121 (2d Cir.1975), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). Addressing each of these criteria in turn, I find that a preliminary injunction should issue.

(1) Irreparable injury would occur if defendant were permitted to pursue withdrawal liability against plaintiff. Plaintiff has lost its customers during the protracted strike, and will be unlikely to regain them in the face of a claim for withdrawal liability. Such a claim, whether valid or not, sends a signal to people in the industry that the company in question is out of business. The testimony of Trustee Finkle is instructive: having been informed only that the claim had been made against TIME–DC, he "assumed they were out of business" and "weren't operating." Finkle Deposition at 19–21. I find that this harm would exist even if plaintiff were compelled to arbitrate the withdrawal liability issue, because arbitration presumes that the Board of Trustees has determined that a permanent cessation of activities had occurred. In practical terms, then, arbitration signals to prospective customers that the company is out of business.

(2) As the discussion of the labor dispute exception's applicability indicates, *see* § III., *supra,* it is unclear whether plaintiff is likely to prevail on the merits. The preliminary injunction is based on the premature nature of the Fund's assertion of withdrawal liability. I do not express an opinion as to whether the statutory labor dispute exception precludes assertion of such liability even after full disclosure has been made to the Trustees, because that factual situation is not now before me. I do find, however, that this motion raises "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Standard & Poor's, supra,* 683 F.2d at 707. I also find that the balance of hardships tips decidedly toward TIME–DC. *Id.* It does not appear that the Fund requires TIME–DC's contributions for any immediate purpose, because plaintiff's contributions to the Fund have represented only 0.53% of the total pool over the past five years, Plaintiff's Exhibits 4 and 5, whereas the Fund has approximately $11 million more in annual income than it requires for expenses.[10] Plaintiff's Exhibit 25. On the other hand, the potential injury to plaintiff has been chronicled. It is enough to note that the assertion of withdrawal liability may paralyze TIME–DC's effort to rebuild its customer base.

(3) Public interest considerations, as expressed in the stated Congressional requirement that multiemployer pension funds remain independent of the interests of both management and labor, also militate in favor of the issuance of a preliminary injunction in this case. *See* § III., *supra.*

Accordingly, the preliminary injunction will issue.

SO ORDERED.

---

**10.** As detailed in Plaintiff's Exhibit 25, the Fund's latest available income statement reveals annual net income of $27.5 million, annual pension payments of $15.8 million, and annual expenses of $390,320. Subtraction of the latter two figures from the former yields the $11 million surplus.