**T.I.M.E.–DC, INC., Plaintiff,**

v.

**I.A.M. NATIONAL PENSION FUND, Defendant.**

**Civ. A. No. 84–3068.**

United States District Court, District of Columbia.

Nov. 7, 1984.

Carl L. Taylor, Donald E. Scott, Washington, D.C., John L. Watson, Denver, Colo., for plaintiff.

Robert T. Osgood, I.A.M. Nat. Pension Fund, Washington, D.C., for defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

The plaintiff in this action, T.I.M.E.–DC, Inc. ("TIME–DC"/"TIME"), is a nationwide trucking firm. The defendant, I.A.M. National Pension Fund (the "Machinists' Fund"/the "Fund"), is a multiemployer pension plan fund within the meaning of the Multiemployer Pension Plans Amendment Act of 1980 (the "Multiemployer Act"/the "MPPAA"), 29 U.S.C. §§ 1002(37)(A), 1301(a)(3) (1983). TIME–DC filed the complaint in this action for declaratory and injunctive relief against the Machinists' Fund as the result of the Fund's assertion of "withdrawal liability" against TIME–DC under the provisions of the Multiemployer Act. Ultimately, the plaintiff seeks a declaration that it is involved in an on-going labor dispute with the International Association of Machinists and Aerospace Workers (the "Machinists"/the "Union"), excepting it from withdrawal liability, and an injunction enjoining the Fund from prosecuting, enforcing or collecting any claim for withdrawal liability against TIME.

This case is presently before the Court on plaintiff's motion for a preliminary injunction. Upon consideration of the plaintiff's motion, the defendant's opposition thereto, the stipulated factual record submitted by the parties,[1] counsel's oral argument on the motion, and the Court's discussion in open court, the Court concludes that plaintiff's motion for a preliminary injunction should be granted insofar as enjoining defendants from pursuing its withdrawal

---

1. In lieu of presenting witnesses. the parties submitted a stipulated factual record for purposes of the preliminary injunction motion. This stipulated record consists of: the affidavit of W. Frank Williamson, Senior Vice President of TIME–DC; the affidavit of Eugene K. Anderson, Vice President of Finance, Secretary and Treasurer of TIME–DC; the deposition of Alan K. Skolnick, Director of the Fund; the depositions of Eugene Glover and George Poulin, Fund Trustees; the deposition of Allison Beck, a representative of the Machinists Union; and documents produced by the Union and the Fund during discovery.

liability assessment of September 14, 1984 against TIME.

### Background: The Multiemployer Act

The first comprehensive framework for federal regulation of private pension plans was the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1381. Under ERISA those plans must exist under written instruments, with plan assets held in trust under the direction and control of one or more fiduciaries. *Id.* §§ 1002–03.

In 1980 Congress enacted the Multiemployer Act to amend ERISA with respect to multiemployer pension plans. Multi-employer plans, as distinguished from single employer plans, are those maintained pursuant to one or more collective bargaining agreements, covering the employees of two or more employers. Employers participating in multiemployer plans normally contribute to the fund at rates specified in the collective bargaining agreement. *See The Washington Star Company v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1504 (D.C. Cir.1984).

Under the Multiemployer Act, the trustees of a multiemployer plan are charged with the duty of quantifying and collecting "withdrawal liability" from an employer who partially or completely withdraws from the plan. *See* 29 U.S.C. §§ 1382, 1399 (1983). These withdrawal liability provisions were enacted by Congress to protect the security of workers covered by multiemployer plans from the deprivation of anticipated retirement benefits. *Washington Star,* 729 F.2d at 1504–05. Under the MPPAA an employer who withdraws from a multiemployer plan incurs a noncontractual liability to the fund, constituting the withdrawing employer's share of the plan's total vested unfunded benefits. *Id.* at 1505. Thus, withdrawal liability in effect serves as a penalty for withdrawing from the plan, exacted because the remaining participants may incur liability for the withdrawing employer's workers. *T.I.M. E.–DC, Inc. v. Trucking Employees of*

*North Jersey Welfare Fund,* 560 F.Supp. 294, 297 (E.D.N.Y.1983).

Under the terms of the MPPAA, an employer may be deemed to have completely withdrawn from participation in the plan, thereby incurring withdrawal liability, when the employer

(1) permanently ceases to have an obligation to contribute under the plan, or

(2) permanently ceases all covered operations under the plan.

29 U.S.C. § 1383(a).

However, the MPPAA also sets forth an exception to withdrawal liability where an employer is engaged in a labor dispute with its employees. Specifically, the Act provides:

Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—

(2) an employer suspends contributions under the plan during a labor dispute involving its employees.

29 U.S.C. § 1398.

The present action involves a determination of the applicability of this labor disputes exception to withdrawal liability to the operations of the plaintiff, TIME–DC.

### Statement of Facts

#### A. The TIME–DC/Machinists Labor Dispute

For decades TIME–DC has operated its interstate trucking business under union contracts. Prior to April 1, 1982, TIME's employees were principally covered by successive nationwide collective bargaining agreements with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Teamsters). Its mechanics, however, were covered prior to April 1, 1982 by separate regional collective bargaining agreements with local Machinists organizations.

In 1979 and 1980 TIME–DC began experiencing a severe business decline, attributable primarily to the 1978 federal deregulation of the trucking industry and the resulting competition with non-union carriers.

Consequently, in 1981 TIME withdrew from multiemployer bargaining with both the Teamsters and the Machinists and endeavored to bargain directly with the Unions for economic relief.

TIME–DC's efforts at individual negotiations with the Teamsters proved unsuccessful. At midnight on March 31, 1982, the date of the expiration of the existing collective bargaining agreement, the Teamsters struck TIME upon the company's failure to sign the new nationwide agreement.

Prior to the Teamsters' strike TIME–DC was also making efforts to negotiate economic relief with the Machinists. However, in March 1982, Machinists working in the company's western states operations, the "Western Machinists," whose collective bargaining agreement also expired on March 31, 1982, rejected the company's initial contract proposal.[2] Thereafter, before subsequent negotiations on another proposal could begin, the Teamsters initiated their strike of March 31, 1982, and the Western Machinists joined in striking TIME–DC at midnight that night.

Aside from the Western Machinists, other regional Machinists' organizations whose collective bargaining agreements had not yet expired, as well as the Oklahoma City Machinists whose collective bargaining agreement also expired March 31, 1982, continued to work in the early days of the Teamsters strike. Eventually, however, the operation of TIME's nationwide commodities division, the division in which all of the Machinists worked, was suspended by the Teamsters' strike. There was, therefore, no work for the non-striking Machinists to perform, and the remaining Machinists were laid off. Shortly thereafter, the remaining Machinists' collective bargaining agreements with TIME–DC also expired.[3]

On May 17, 1982, the striking Western Machinists made an unconditional offer to return to work. According to TIME's Vice President, a representative of the Machinists indicated that the purpose of this offer was merely to qualify the Western Machinists for unemployment compensation while the Teamsters strike continued. (Williamson Aff. at ¶ 27.) Regardless of the Machinists' motivation, given that the Teamsters strike continued, there was still no work for the Western Machinists, as there was none for the Machinists throughout the company's general commodities division. Therefore, the company did not recall any Machinists at that time.

By letter dated August 18, 1982, the Teamsters' Union offered to return its employees to work at TIME–DC without a contract. Negotiations on this offer continued until November due to TIME's efforts to get the Teamsters to agree not to resume their strike after the company reopened its general commodities operation. After obtaining a commitment from the Teamsters that they would not strike for a period of time equal to the length of the strike to date, TIME–DC began reopening its western general commodities operation in December, 1982 at wage rates and other terms specified by the company.

In November, TIME had informed the Western Machinists that, because the Teamsters were willing to return to work without a new collective bargaining agreement, the company also wished to begin recalling Machinists on the same terms. On November 22, 1982, the Western Machinists responded, however, that any recall of their members had to be on the terms of the expired 1979–1982 contract, terms unacceptable to the company.

In mid-January of 1983 TIME tendered to the Western Machinists a written "final offer" to enter into an interim agreement. On March 1, 1983 the Western Machinists rejected the interim contract offer, again asserting that they would withhold services

---

**2.** The Western Machinists include those employed at TIME–DC's locations in Los Angeles, San Francisco, Portland, Seattle, Phoenix and Denver.

**3.** TIME's last collective bargaining agreement with the Chicago Machinists and the Buffalo Machinists expired on April 30, 1982, while its last agreement with the St. Louis Machinists expired on June 30, 1982.

on terms other than the expired collective bargaining agreement. Therefore, in light of the failure of the Machinists to return to work after the Teamsters returned to work in December, 1982, TIME–DC gave its mechanic work to independent contractors.

In August of 1983 the company again attempted to recall Machinists, offering work to eighteen machinists on its seniority list for Los Angeles and Seattle. None of these Machinists returned to work at TIME–DC.

In September 1983 TIME–DC hired one new union mechanic for its Los Angeles terminal. This mechanic was terminated in early 1984, however, because he was not regarded as sufficiently skilled to do the work.

Since the Western Machinists' rejection of TIME–DC's interim contract offer on March 1, 1983, there apparently have not been any substantive contract negotiations between TIME and the Western Machinists. However, the Union has never formally notified TIME that it no longer represents the Machinists or has otherwise "walked away from the strike."

B. *Pension Fund's Assessment of Withdrawal Liability*

Several of the collective bargaining agreements between TIME–DC and various regional Machinists' organizations that expired in 1982 provided for contributions by TIME to a Multiemployer Pension Plan sponsored by the defendant, I.A.M. National Pension Fund. Specifically, Western Machinists at TIME–DC's Los Angeles and Phoenix facilities, and Machinists at TIME's Oklahoma City and Buffalo facilities are covered by two plans maintained by the defendant fund. Plan "A" covered the Western and Oklahoma City Machinists while Plan "B" covered one Machinist in the Buffalo, New York facility. Only Plan "A" is at issue in the present action.

At all times pertinent to this case, the director of the Fund has been Alan W. Skolnick. On June 30, 1983 Skolnick, without approval of the Board of Trustees, and lacking any independent investigation of the facts, sent TIME–DC a letter stating that the company had incurred withdrawal liability with respect to Plan "A" under the Multiemployer Act, asserting that TIME had ceased all covered operations under the plan as of March 27, 1982. On September 7, 1983, Skolnick sent TIME another notice of withdrawal liability, asserting that TIME had ceased all covered operations under the Plan as of June 27, 1982. Thereafter, on September 23, 1983 the Fund sent TIME a demand for withdrawal liability of $449,955, due in quarterly payments of $54,749 beginning October 20, 1983.

TIME–DC informed the Fund on October 20, 1983 that it regarded itself as falling under the "labor disputes" exception to withdrawal liability under the Multiemployer Act, and that the company had not gone out of business. TIME further informed the Machinists' Fund that one Teamster Pension Fund had already been enjoined from asserting withdrawal liability against TIME under the labor disputes exception, enclosing a copy of Judge McLaughlin's decision in *TIME-DC, Inc. v. Trucking Employers of North Jersey Welfare Fund, Inc.,* 560 F.Supp. 294 (E.D.N.Y.1983). TIME also informed the Machinists' Fund that it had sued a second Teamster Pension Fund in New York to enjoin its withdrawal liability demand under the labor disputes exception.

At a meeting of the Machinists' Fund's Trustees on November 2, 1983 a motion was adopted to defer the assessment of withdrawal liability until the Trustees' January 1984 meeting pending further investigation of TIME–DC's status by Trustee Stanley Jensen. By letter dated November 21, 1983 Jensen forwarded to Skolnick a copy of a letter, dated November 19, 1983, from Wally Wright, the Grand Lodge Representative of the Machinists. Wright's letter indicated that TIME–DC was presently employing the one mechanic at its Los Angeles facility for which it was making contributions to the Machinists' Fund.

At the January 25, 1984 meeting of the Fund's Trustees, it was decided that no

further action to assess withdrawal liability against TIME–DC would be taken at that time.

On June 27, 1984, another Trustees' meeting was held, and TIME–DC's status was again considered. *According to the materials prepared by Fund Director Skolnick for the meeting, the Trustees were to consider two questions regarding TIME–DC: (1) Was TIME–DC subject to withdrawal liability? and (2) If so, when? The materials also stated that the one mechanic working in the Los Angeles facility was terminated in February 1984.*

Fund Director Skolnick's notes of the June 1984 Trustees meeting suggest that the Fund regarded TIME–DC as having incurred withdrawal liability as of February 2, 1983 in light of a perceived impasse between the Union and the company. Trustee Eugene Glover testified, however, that the Trustees agreed to assess withdrawal liability against TIME because there was no collective bargaining agreement between TIME and the Union, and the Union no longer represented TIME's employees or otherwise had a relationship with the company. Glover also doubted that the Trustees found February 1983 to be the date TIME incurred this liability, but could not state what date he believed was established.

In any event, on September 14, 1984 the Fund formally renewed its withdrawal liability demand against TIME–DC by letter, asserting that the Company incurred withdrawal liability as of March and April 1982 by having ceased participation in the Plan, thereby reactivating the demand of $449,-955.00 that the fund had held in abeyance since November 7, 1983. The September 14, 1984 letter demanded the first quarterly payment of $54,749 by September 29, 1984. That deadline was subsequently extended to October 6, 1984. On October 2, 1984 the plaintiff instituted this action.

## Discussion

This case constitutes the third time that TIME–DC has sought a preliminary injunction against a multiemployer pension plan as the result of an assessment of withdrawal liability. Both of the previous cases involved TIME's efforts to obtain such an injunction against Teamster pension plans. In *T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fund,* (the "*North Jersey Fund*" case), 560 F.Supp. 294 (E.D.N.Y.1983), the court found that the defendant pension fund had improperly assessed withdrawal liability against TIME based on the representation of a local Teamster union official that TIME–DC had ceased operations at its Brooklyn terminal. *Id.* at 303. The court held in *North Jersey Fund* that the Fund had an obligation to undertake an independent investigation of the facts before assessing withdrawal liability in order to determine whether TIME fit within the labor disputes exception. *Id.* The court also found in *North Jersey Fund* that the labor dispute between TIME and the Teamsters continued, despite the fact that the Teamsters had returned to work, because there was still no new contract between the parties resolving the labor controversy. *Id.*

Likewise, in *T.I.M.E.–DC, Inc. v. New York State Teamsters Conference Pension and Retirement Fund* (the "*New York Fund*" case), 580 F.Supp. 621 (N.D. N.Y.1984), the court also held that the pension fund had improperly assessed withdrawal liability in light of the labor disputes exception. *Id.* at 630–31. In doing so, the Court rejected defendant's contention that the labor disputes exception was no longer applicable because TIME and the Teamsters had reached an impasse in negotiations. *Id.* at 629. Instead, the court held in *New York Fund* that even if TIME and the Teamsters had reached an impasse, that did not signal the end of the labor dispute, but was merely another stage in the dispute. *Id.*

Although the *North Jersey Fund* and *New York Fund* cases are instructive in construing the labor disputes exception to withdrawal liability, because the present case involves TIME's relationships with the Machinists rather than the Teamsters, this Court must independently examine the

facts and circumstances to determine whether a preliminary injunction should issue.

■ Four factors must be weighed by this Court in considering a motion for preliminary injunction:

1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal? ...

2) Has petitioner shown that without such relief it will be irreparably injured? ....

3) Would the issuance of an ... [injunction] harm other parties interested in the proceedings? ...

4) Where lies the public interest? ...

*Virginia Petroleum Jobbers Assoc. v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958). *See also e.g., National Association of Farm Workers v. Marshall,* 628 F.2d 604, 613 (D.C.Cir.1980) (quoting *Virginia Petroleum*). With respect to the motion for preliminary injunction in this action, both parties have emphasized the first two factors set forth above—TIME–DC's ultimate likelihood of success on the merits, and the risk of irreparable harm, or lack thereof, to TIME if the injunction is not issued.

### (1) *Likelihood of Success on the Merits*

As set forth above, the labor dispute exception of the Multiemployer Act states that an employer shall not be considered to have withdrawn from a pension plan, and hence have incurred withdrawal liability under the Act, if the employer merely "suspends contributions under the plan during a labor dispute involving its employees." 29 U.S.C. § 1398 (1983). In the present case, the defendant Machinists' Fund's September 14, 1984 assessment of withdrawal liability against TIME–DC asserted that such liability arose as of March and April of 1982. These dates, however, are those associated with the expiration of TIME's collective bargaining agreements with the Teamsters and the Western Machinists, and the initiation of strikes by those unions against TIME. The defendant's Proposed Findings of Fact and Conclusions of Law in Opposition to Plaintiff's Motion for a Pre-

liminary Injunction clearly recognizes the initiation of the strike by the Western Machinists on March 31, 1982. *Id.* at ¶ 4. Moreover, defendants concede that although the Machinists formally called off the strike on May 17, 1982, subsequent negotiations on a new collective bargaining agreement between TIME and the Machinists were unsuccessful, and the Machinists in fact failed to return to work when TIME resumed operations in December 1982. *Id.* at ¶ 5.

Despite the defendant's concession of the existence of a labor dispute at least to the extent outlined above, the defendant nevertheless attempts to defend the position that TIME–DC incurred withdrawal liability as of March and April 1982. The defendant asserts "To be sure, such a [labor] dispute at one point existed, but has long since ended." Defendant's Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction, at 10. The defendant, therefore, adopts the paradoxical argument that a labor dispute in fact existed, but that the labor disputes exception to withdrawal liability is nevertheless wholly inapplicable to the case at hand. The defendant argues that its assessment of withdrawal liability, asserted to have been incurred as of March and April 1982, was the result of the Trustees' policy that withdrawal liability arises as of the date of the expiration of a contributing employer's collective bargaining agreement with the union if the employer does not reach a new collective bargaining agreement within the next twelve months, unless a strike is underway. *Id.* at 5.

■ The Court concludes that the defendant's September 14, 1984 assessment of withdrawal liability against TIME under this "policy," asserting that TIME incurred such liability as of March and April 1982, completely failed to give proper consideration to the labor disputes exception to withdrawal liability. Under the longstanding definition embodied in the National Labor Relations Act, a labor dispute is "any controversy concerning terms, tenure or conditions of employment." 29 U.S.C. § 152(9) (1983). As recognized by Judge Miner in

the *New York Fund* case, this definition of a labor dispute is equally applicable to the Multiemployer Act. 580 F.Supp. at 627. A labor dispute clearly exists where there is an on-going strike. Such a strike exists even in the absence of "active picketing," and is instead any "conceded stoppage of work." *See* 29 U.S.C. § 142(2) (1983). Moreover, as Judge Miner held in the *New York Fund* case, even an impasse in negotiations does not signal the end of a labor dispute. 580 F.Supp. at 629.

■ Under any definition of a labor dispute set forth above, it is clear that as of March and April 1982 TIME–DC was involved in a labor dispute with the Western Machinists. Therefore, in asserting that TIME incurred withdrawal liability at that time, the defendants failed to give proper consideration to the existence of a labor dispute between TIME and the Machinists. Accordingly, the plaintiff has made more than a substantial showing of success on the merits with respect to enjoining the defendant from enforcing its withdrawal liability demand of September 14, 1984.[4]

The Court expresses no opinion at this stage of the proceeding as to whether the labor dispute between TIME and the Western Machinists is presently ongoing, recognizing a distinction between the current status of the Teamsters, presently working without a contract, and the Machinists. The Court finds, however, that the defendant has not yet considered facts upon which it could conclude that the labor dispute between TIME and the Machinists has ended. To the extent that Fund Director Skolnick's notes of the June 27, 1984 Trustees meeting may be construed as reflecting the Trustees' intention to assess withdrawal liability against TIME on the basis of a perceived impasse in negotiations between TIME and the Western Machinists, this Court concurs with Judge Miner's assertion in *New York Fund* that, as "merely a stage in the labor dispute, there is simply no talismanic significance to the presence of an 'impasse.'" 580 F.Supp. at 629.

Furthermore, even if the Trustees had in fact, as Trustee Glover testified, decided to assess withdrawal liability based on their conclusion that the Union had abandoned the company's workers, this also may not alone support an assertion of withdrawal liability. Plaintiff concedes that if the Union "walks away from the shop" the labor dispute may in fact be regarded as over. However, the record in this action to date contains no evidence upon which the Trustees could conclude that the Machinists Union has abandoned the labor dispute.

In the *North Jersey Fund* case, Judge McLaughlin stated:

> A Fund that seeks to assert withdrawal liability against an employer claiming to fit within the labor dispute exception, has, at minimum, a duty to undertake an inquiry of the factual circumstances. This rule is derived from the long-established requirement that pension funds act independently of the interests of both management and labor.

560 F.Supp. at 303. Implicit in Judge McLaughlin's holding is the understanding that, in reviewing the facts, the pension fund has an obligation to make a good faith determination of whether, as a matter of law, a labor dispute continues to exist between the parties. Therefore, this Court

---

**4.** The Court also rejects defendant's assertion that plaintiff must make a two part showing under the labor disputes exception that (1) payments to the plan were merely *suspended,* not permanently ceased, *and* (2) they were suspended because of a labor dispute. *See* 29 U.S.C. § 1398. The defendant asserts that TIME cannot be regarded as having merely suspended contributions in light of the passage of time since the collective bargaining agreement expired. The Court finds, however, that under a fair reading of the statute an employer's failure to make contributions during an on-going labor dispute is to be *characterized* as a suspension rather than a termination of payments. Furthermore, even if defendant's position had merit, clearly TIME–DC did not permanently cease making contributions as of March and April 1982. As defendant's own records reflect, TIME–DC made contributions after April 1982 for the one mechanic it had working at its Los Angeles facility. Despite the defendant's efforts to assert that these were not "meaningful" contributions, the fact remains that TIME did not permanently cease making all contributions as of March and April 1982.

finds that the defendant Fund's September 14, 1984 assessment of withdrawal liability against TIME–DC was, on the facts before the Trustees, clearly erroneous under the labor disputes exception to the Multiemployer Act. Furthermore, in considering any future assessment of withdrawal liability against TIME–DC, the defendant is statutorily bound by the Multiemployer Act to determine whether the labor dispute between TIME and the Machinists has ended, and if so, at what point in time. In doing so, the Fund must be guided by the discussions of labor disputes in this Court's decision, as well as the *New York Fund* and *North Jersey Fund* cases, and other appropriate sources.

### (2) *Irreparable Harm*

Even given the impropriety of defendant's assessment of withdrawal liability, defendant contends that plaintiff is not entitled to a preliminary injunction because it has failed to establish that it will be irreparably injured in the absence of such an injunction. The Fund asserts that, in the absence of an injunction, TIME can commence arbitration under the Act of the withdrawal assessment. *See* 29 U.S.C. § 1401(a). Furthermore, the Fund argues that, even if TIME failed to invoke the statute's arbitration procedures, and the Fund accelerated the entire amount of withdrawal liability, plus accrued interest from the missed payment date, *see* 29 U.S.C. § 1399(c)(3) & (5), the Fund would still have to institute a collection suit in which TIME could defend on the merits.

This Court is persuaded, however, that the plaintiff has carried its burden of establishing that it will suffer irreparable injury if the defendant is not enjoined from pursuing its withdrawal liability claims. As stated by Judge McLaughlin in *North Jersey Fund*:

> Irreparable injury would occur if defendant were permitted to pursue withdrawal liability against plaintiff. Plaintiff has lost its customer base during the protracted strike, and will be unlikely to regain them in the face of a claim for withdrawal liability. *Such as claim,*

*whether valid or not, sends a signal to people in the industry that the company in question is out of business.*

560 F.Supp. at 304 (emphasis added). *See also New York Fund,* 580 F.Supp. at 631 ("threats of diminished consumer confidence and elimination of business opportunities are clearly consequences constituting irreparable harm").

■ Furthermore, as also noted by Judge McLaughlin, this harm would exist even if plaintiff invoked the statute's arbitration procedure since the Multiemployer Act makes a fund's determination of withdrawal liability presumptively correct in arbitration. *North Jersey Fund,* 560 F.Supp. at 304. *See also* 29 U.S.C. § 1401(a)(3)(A) (1983).

Defendant asserts that the findings in *North Jersey Fund* and *New York Fund* as to the potential impact of an assessment of withdrawal liability on TIME's ability to rebuild its customer base cannot be adopted by this Court because those findings were made months ago, and TIME's business stability has substantially improved since then. Nevertheless, the affidavit of TIME's Vice President, W. Frank Williamson, asserts that TIME continues to struggle to reestablish its reopened general commodities operations. (Affidavit of W. Frank Williamson, at ¶ 62.) As in the *New York Fund* case, the defendant has failed to present evidence controverting the testimony of Mr. Williamson that TIME–DC's renewed trucking operations remain vulnerable to the "false signal" sent by an improper assessment of withdrawal liability. *See New York Fund,* 580 F.Supp. at 631.

Plaintiff also asserts that it is threatened with irreparable harm by the fact that TIME could face similar improper assertions of withdrawal liability from 27 other pension funds. TIME asserts that the total potential liability to all twenty-seven funds is approximately $30 million, and would force TIME into bankruptcy in six months. Affidavit of Eugene K. Anderson at ¶ ¶ 15–17. The Court finds, however, that only seven of these 27 funds are Machin-

ists', as opposed to Teamsters', funds, and could thus logically equate themselves with the defendant in this case. The plaintiffs have failed to present evidence of the severity of the potential financial impact of the seven *Machinists* funds assessing withdrawal liability against TIME–DC. Nevertheless, even the *improper* assertion of withdrawal liability by other funds, whether Machinist or Teamster, sparked by the defendant's success on this motion, would severely compound the "false signal" that TIME–DC had gone out of business, severely affecting its relationship with customers and competitors. Therefore, the Court finds that the risk of irreparable harm to TIME merits the issuance of a preliminary injunction.

### (3) & (4) *Hardship to Others and the Public Interest*

Finally, the Court finds that the interest of the defendant and/or the interest of the public in the present case do not tip the scales away from TIME–DC. As discussed above, TIME–DC has gone beyond showing a substantial likelihood of success on the merits. The plaintiff has demonstrated that the defendant's September 14, 1984 assessment of withdrawal liability was clearly erroneous under the labor disputes exception in holding that TIME incurred withdrawal liability as of March and April 1982. Furthermore, the defendant has made no assertion of harm it would suffer as the result of the issuance of the injunction.

Finally, with respect to the public interest, the Court finds that although the public has a strong interest in the financial stability and independence of multiemployer pension plans, the public's overwhelming interest is in assuring that the fiduciaries of such plans make well informed impartial decisions within their statutory guidelines.

Under all of the factors discussed above, therefore, the Court finds that plaintiff is entitled to a preliminary injunction with respect to the defendant's September 14, 1984 assessment of withdrawal liability. Accordingly, pending a determination on the merits of this action, defendant is hereby enjoined from taking any action to enforce its demand of September 14, 1984 under the withdrawal liability provisions of 29 U.S.C. §§ 1381–1405 (1983) against plaintiff, including any effort to:

(i) prosecute, enforce, collect, or accelerate the amount of withdrawal liability claimed;

(ii) declare that plaintiff is in default of its obligations or has waived any procedures under the Multiemployer Act;

(iii) compel or commence any dispute with plaintiff concerning the claim.

Furthermore, the parties shall file with the Court within 15 days from the date of this decision memoranda addressing whether they will enter into a consent permanent injunction with respect to the September 14, 1984 assessment, or why the Court should not enter a permanent injunction on this matter under Rule 65(a)(2) of the Federal Rules of Civil Procedure.