**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; Central States, Southeast and Southwest Areas Health & Welfare Fund and Howard McDougall, Trustee, Plaintiffs/Counterdefendants,**

v.

**T.I.M.E.–DC, INC., Defendant/Counterplaintiff.**

**Civ. A. No. CA3–86–1033–D.**

United States District Court, N.D. Texas, Dallas Division.

July 25, 1986.

</div>

Charles P. O'Connor, Margery Sinder Friedman, Robert D. Manfred, Jr., of Morgan, Lewis & Bockius, Washington, D.C.; William Baab, of Mullinax, Wells, Baab & Cloutman, P.C., Dallas, Tex.; and Karen I. Ward, Associate General Counsel, Central States, Southeast and Southwest Areas Pension Fund, Chicago, Ill., for plaintiffs/counterdefendants.

Carl L. Taylor, Jeffrey S. Davidson, Michael E. Baumann, of Kirkland & Ellis, Washington, D.C.; and George W. Bramblett, Haynes & Boone, Dallas, Tex., for defendant/counterplaintiff.

## MEMORANDUM OPINION

FITZWATER, District Judge.

This is at least the sixth[1] installment in the saga of the efforts of T.I.M.E.–DC, Inc.

("TIME–DC") to enjoin a multiemployer pension fund, in this case the Central States, Southeast and Southwest Areas Pension Fund ("CSF"), from assessing withdrawal liability[2] against it pursuant to the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). On TIME–DC's motion for preliminary injunction, presented by the parties on Fed.R.Civ.P. 43(e) affidavits, the court must decide whether TIME–DC has satisfied the *Canal Authority*[3] requirements for obtaining a preliminary injunction. In particular, the court must determine whether TIME–DC is likely to succeed on the merits of its claim that, at the time CSF assessed withdrawal liability, there was an ongoing labor dispute between TIME–DC and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America ("IBT") that exempted TIME–DC from withdrawal liability. The court must also decide whether TIME–DC's claim must be dismissed for failure to exhaust the arbitration procedure of MPPAA. For the reasons that follow, the court concludes that *Canal Authority* has been satisfied, that TIME–DC's claim should not be dismissed, and that a preliminary injunction should issue.[4]

1. *See also T.I.M.E.–DC, Inc. v. Western Conference of Teamsters Pension Trust Fund*, No. C–86–3031 RFP (N.D.Cal. June 9, 1986) *("Western Conference Fund")*; *T.I.M.E.–DC, Inc. v. New England Teamsters and Trucking Industry Pension Fund*, No. 85–2690–W (D.Mass.—still pending) *("New England Fund")*; *T.I.M.E.–DC, Inc. v. I.A.M. National Pension Fund*, 597 F.Supp. 256 (D.D.C.1984), and 616 F.Supp. 400 (D.D.C.1985) *("IAM Fund")*; *T.I.M.E.–DC, Inc. v. New York State Teamsters Conference Pension & Retirement Fund*, 580 F.Supp. 621 (N.D.N.Y.), *aff'd*, 735 F.2d 60 (2d Cir.1984) (per curiam) *("New York Fund")*; and *T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fund, Inc.*, 560 F.Supp. 294 (E.D.N.Y.1983) *("North Jersey Fund")*.

2. "Withdrawal liability" is a non-contractual liability for employers who withdraw from multiemployer pension plans. Such liability represents a share of the pension plan's total vested unfunded liability and is not necessarily related to the way in which the liability arose. Because

an employer may incur liability for the pensions of other employers' workers, withdrawal liability works as a penalty on an employer who withdraws from the plan. *North Jersey Fund*, 560 F.Supp. at 297.

3. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974). The movant for a preliminary injunction has the burden of proving four elements:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable injury if the injunction is not issued;

(3) that the threatened injury to the movant outweighs any damage the injunction might cause to the opponent; and

(4) that the injunction will not disserve the public interest.

4. This memorandum opinion constitutes the court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a).

## I.

### PROCEDURAL HISTORY AND STATUTORY FRAMEWORK

*Procedural History*

On April 15, 1986, CSF, together with another IBT fund and a trustee of both funds,[5] filed a complaint in this court to collect from TIME–DC unpaid contributions, interest, statutory penalties, and attorney's fees which they contend TIME–DC is obligated to pay pursuant to the terms of a collective bargaining agreement, a trust plan and trust agreement, and federal labor law. CSF contends TIME–DC failed to make timely payments to the trust funds for the time periods for which contributions were due under the collective bargaining agreement.

Thereafter, TIME–DC filed its answer and counterclaim and its answer and first amended counterclaim ("counterclaim"). By its counterclaim TIME–DC seeks a declaratory judgment and injunctive relief against CSF against the threat of prosecution, enforcement, or collection of a claim made against TIME–DC for $18,432,748.94 in withdrawal liability under MPPAA. (*See* TIME–DC May 27, 1986 Memo. Ex. I). TIME–DC urges that it is exempted from liability under MPPAA's labor dispute exemption. Alternatively, TIME–DC seeks to offset against such liability certain sums of money that TIME–DC contends CSF has lost due to alleged breaches of fiduciary duty, waste, mismanagement and other improper actions taken by CSF's trustees, former trustees, and other fiduciaries. TIME–DC contends these acts have caused an underfunding of CSF, absent which little or no withdrawal liability would be due. TIME–DC alternatively seeks a declaration that MPPAA, as applied, is unconstitutional, that TIME–DC has been injured within the meaning of the Racketeer Influenced and Corrupt Organizations Act if TIME–DC is required to pay withdrawal liability attributable to the unlawful acts of CSF, and that MPPAA is unconstitutional in that it denies TIME–DC due process of law if

TIME–DC is required to raise its labor dispute defense in an arbitration forum. (Counterclaim at 8–9).

On May 27, 1986, TIME–DC applied for a temporary restraining order to preclude CSF from assessing withdrawal liability. After considering briefs and conducting a hearing by teleconference, the court on May 30, 1986 issued a temporary restraining order. On July 10, 1986, the court extended the restraining order until July 25, 1986 to afford the court ample time to consider the substantial briefs and supporting evidence submitted in support of and in opposition to TIME–DC's motion for preliminary injunction.

TIME–DC's motion is premised on considerably narrower grounds than is its counterclaim. TIME–DC contends CSF's assessment of withdrawal liability violates MPPAA's labor dispute exemption, arguing that: (1) the labor dispute between TIME–DC and IBT continues because there has been no good faith and unequivocal disclaimer of representation of TIME–DC's employees by all IBT locals within the CSF geographical area; (2) CSF and IBT's Teamsters National Freight Industry Negotiating Committee ("TNFINC") colluded to precipitate an end to the labor dispute, which voids any inference that the locals have disclaimed; (3) the deadlock in TIME–DC and IBT negotiations is no basis for the assertion of withdrawal liability; (4) there is a stipulated labor dispute through at least April 1986; and (5) TIME–DC is ready and able to recommence operations within CSF's territorial jurisdiction if TIME–DC gets a contract or a no-strike pledge.

CSF contends: (1) the CSF trustees reasonably concluded that TIME–DC had permanently ceased contributions to CSF because the facts underlying the trustee's determination were accurate and because the facts presented to the trustees supported a determination that the labor dispute had ended; (2) TIME–DC's assertions of collusion are unsupported; (3) the disclaimers by IBT locals were effective,

---

**5.** The Central States, Southeast and Southwest Areas Health & Welfare Fund and Howard McDougall, a trustee of the fund and of CSF.

clear, and unequivocal and include all the locals within CSF jurisdiction; (4) even if the disclaimers are deficient, TIME–DC cannot avoid withdrawal liability because the facts otherwise indicated that TIME–DC had permanently ceased contributions to the Fund, there had been a lack of bargaining for over 32 months, and TIME–DC failed to resume operations within CSF jurisdiction; (5) TIME–DC is unable to recommence operations in the CSF geographic area; and (6) CSF has correctly calculated TIME–DC's withdrawal liability.

*Statutory Framework*

In 1980, Congress enacted MPPAA, 29 U.S.C. §§ 1381 *et seq.*, to ensure further the fiscal soundness of multiemployer pension plans [6] adopted pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The staggering size of the unfunded vested liabilities of multiemployer pension plans such as CSF [7] influenced Congress to rewrite ERISA's pension plan termination insurance program as it applied to multiemployer plans. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722–25, 104 S.Ct. 2709, 2714–16, 81 L.Ed.2d 601 (1984). To alleviate the burdens on plans and on employers that remained when an employer/contributor withdrew from a plan, Congress provided for the imposition of withdrawal liability on employers that ceased their contribution obligations. *Id.* at 724–25, 104 S.Ct. at 2715–16. This burden arises because, as noted, such funds usually have unfunded but vested benefit liabilities. For example, at the end of 1985, CSF had net assets of approximately $6.4 billion (CSF Ex. 1 at 2) but had unfunded vested liabilities of $3.021 billion. CSF Ex. 1 at 24. CSF's trustees are obligated to collect withdrawal liability to ensure that the plan receives all funds to

which it is entitled so that those funds can be used on behalf of participants and beneficiaries. *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, — U.S. —, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447 (1985).

MPPAA requires fund trustees to demand payment of withdrawal liability "as soon as practicable after an employer's complete or partial withdrawal." 29 U.S.C. § 1399(b)(1)(B). After receiving the trustees' demand, the employer has the right to ask the trustees to review their determination, 29 U.S.C. § 1399(b)(2)(A), and the trustees must then afford "a reasonable review of any matter raised." 29 U.S.C. § 1399(b)(2)(B). In connection with the review process the employer has the right to submit any information that is relevant to the trustees' determination.

MPPAA also establishes exemptions from the obligation to pay withdrawal liability. The exemption at issue in the instant case is the labor dispute exemption, which provides that an "employer shall not be considered to have withdrawn from the plan solely because—... (2) an employer suspends contributions under the plan during a labor dispute involving its employees." 29 U.S.C. § 1398.

As discussed below, in order to determine whether the TIME–DC–IBT labor dispute had ended on April 23, 1986, when CSF assessed withdrawal liability against TIME–DC, the court must first decide what is a "labor dispute" within the meaning of the exemption. Section 1398 does not define the term. The term is, however, defined in other labor laws such as the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(9), the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 142(3), and the Norris-LaGuardia Act ("NLA"), 29 U.S.C. § 113(c).[8] Use of the same lan-

---

**6.** A multiemployer pension plan, in the trucking industry, is administered under the collective bargaining contract. Under the contract, each employer contributes on a formula basis according to the hours worked by its union employees. *North Jersey Fund,* 560 F.Supp. at 297.

**7.** CSF is a collectively bargained, jointly-administered trust fund established pursuant to § 302(c)(5) of the Labor-Management Relations

Act of 1947 ("LMRA"), 29 U.S.C. § 186(c)(5). (CSF Memo. at 2).

**8.** A "labor dispute" is not synonymous with a "strike," which the LMRA defines as a "concerted stoppage of work by employees ... and any concerted showdown or other concerted interruption of operations by employees." 29 U.S.C. § 142(2).

guage in various enactments dealing with the same general subject matter is a strong indication that the statutes should be interpreted to mean the same thing. *See, e.g., Northcross v. Board of Education of Memphis City Schools,* 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973); *Riddell v. National Democratic Party,* 624 F.2d 539, 543 (5th Cir.1980).

The NLRA defines the term "labor dispute" to include:

> Any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 152(9). The LMRA adopts this definition. *See* 29 U.S.C. § 142(3). The NLA definition is virtually identical, omitting only the word "tenure." *See* 29 U.S.C. § 113(c).[9] From the evidence adduced by the parties, interpreted in light of these definitions, the court concludes that TIME–DC and IBT were still in a labor dispute, albeit perhaps its last vestiges, on April 23, 1986, and at that time the CSF trustees lacked a legal basis under MPPAA to assert withdrawal liability. In so holding the court focuses upon the portion of the statutory definition of the term "labor dispute" that includes

> any controversy concerning ... the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment....

The preliminary injunction evidence reflects that there was controversy, even after April 23, 1986, between TIME–DC, on the one hand, and the TNFINC and IBT locals representing TIME–DC employees on the other, concerning the association or representation of TIME–DC employees.

## II.

## LIKELIHOOD OF SUCCESS ON THE MERITS

■ The first question presented is whether TIME–DC is likely to prevail on its claim that MPPAA's labor dispute provision exempts it from withdrawal liability. The court concludes that TIME–DC is likely to prevail.

*Relevant Facts*

Since the 1960's TIME–DC has been a unionized carrier of general and special commodities whose employees were represented by IBT and other unions. TIME–DC was represented in collective bargaining negotiations by Trucking Management, Inc. ("TMI"), a multiemployer association. TMI, on behalf of the trucking industry, and TNFINC, on behalf of IBT locals, periodically entered into, and TIME–DC accordingly operated pursuant to, the National Master Freight Agreement. The last agreement to which TIME–DC was a party covered the term April 1, 1979 to March 31, 1982. Pursuant to the agreement, TIME–DC made contributions to CSF for many of its employees within the Fund's jurisdiction. Contributions reached an annual high of $2,407,350 in 1980, and in 1985 reached an annual low of $6,050. (CSF Ex. 20, at 2).

In September 1981, TIME–DC notified TNFINC that TIME–DC no longer desired to participate in the multiemployer—TNFINC bargaining process but would, instead, bargain directly with TNFINC for a contract applicable only to TIME–DC. (Anderson Aff. at ¶ 13). The negotiations were not successful because TNFINC insisted on TIME–DC's agreeing to pay the "industry-wide" rates set forth in the new National Master Freight Agreement. TIME–DC, on the other hand, insisted on substantial wage and fringe benefit conces-

---

**9.** Cases that interpret these definitions are not particularly helpful in the instant case because "labor dispute" in those contexts is to be construed broadly and liberally. *E.g., Jacksonville Bulk Terminals, etc. v. International Longshoremen's Association,* 457 U.S. 702, 720, 102 S.Ct. 2672, 2684, 73 L.Ed.2d 327 (1982). In the context of MPPAA, the term should probably be narrowly construed and the court has so construed the term in granting a preliminary injunction.

sions. As a result, IBT struck TIME–DC on April 1, 1982, resulting in a complete shutdown of TIME–DC's general commodities operation. IBT locals established picket lines at virtually all TIME–DC terminals and, within weeks, TIME–DC "shut down" 80 or 85 of the approximately 100 terminals that it operated, removed office furniture and operating equipment, and, by May 1982, released its entire sales staff.[10] (Anderson Dep. at 101–03).

The strike continued until August 1982, at which time IBT made an unconditional offer to return to work. IBT locals ceased picketing at virtually all TIME–DC locations. (*Id.* at 101). In January 1983, IBT terminated strike benefits to its TIME–DC employee members. (CSF Ex. 8).

In December 1982, TIME–DC commenced a limited general commodities operation on the west coast, operating at first only between Los Angeles and Seattle. Later, in Spring 1983, TIME–DC expanded the operation to Portland and San Francisco, which remains the scope of the west coast operation today. (Anderson Aff. at ¶ 22). TIME–DC's west coast operation has not reported a monthly profit since it reopened in December 1982. In March 1983, TIME–DC prepared a one-page business expansion plan for reestablishing a nationwide general commodities operation but the plan has not been updated or supplemented since its original preparation. (Anderson Dep. at 51). The resumption of TIME–DC's west coast operation did not lead to a resumption of CSF contributions. The operation is outside CSF jurisdiction and TIME–DC employees on the west coast work under different terms and conditions (pension fund contributions based upon actual days worked versus full week basis). (*See* CSF Ex. 10).

In December 1982, IBT informed TIME–DC that it desired to renew bargaining. The parties negotiated face-to-face on August 30, 1983 and September 26, 1983. (CSF Ex. 11 at 6–7). Since then there have been no direct negotiations. In 1984 there

was a single exchange of letters. (Anderson Dep. at 54–55). TNFINC accused TIME–DC of manufacturing the labor dispute as a cover for a *sub rosa* plan to terminate its general commodities operation while avoiding paying withdrawal liability. TIME–DC accused TNFINC of taking refuge in invective. (CSF Exs. 12 and 13).

CSF states that it has monitored the TIME–DC—IBT dispute since 1982. In May 1983, CSF requested information from TIME–DC and TIME–DC completed a 14-page form entitled "Statement of Business Affairs," which it returned to CSF. TIME–DC's counsel also submitted a letter to CSF. TNFINC was asked by CSF to comment on TIME–DC's response. TNFINC's response was forwarded to TIME–DC's counsel for comment. TIME–DC's counsel responded to TNFINC's comments. In May 1985, CSF again asked TIME–DC to complete a "Statement of Business Affairs." TIME–DC returned the form on June 14, 1985. (CSF Exs. 23–26, 28).

Not until October 1985, however, did TNFINC poll its TIME–DC locals to determine if they were willing to disclaim further interest in representing TIME–DC employees. The parties dispute the animus for this effort. CSF contends the decision was based on TNFINC's having lost hope of securing an acceptable contract with TIME–DC and having determined that the interests of its members would best be served by removing any impediment to the assessment of withdrawal liability against TIME–DC. TIME–DC posits that it was part of a collusive effort between IBT and CSF to orchestrate imposition of withdrawal liability.

At their October 22–23, 1985 meeting, the CSF trustees received a report on the status of the TIME–DC situation. The report concluded that the TIME–DC—IBT labor dispute was "over or will continue forever" and, based upon prior federal court decisions involving TIME–DC and other

---

**10.** TIME–DC's special commodities operation continued and resulted in pension contributions on behalf of approximately 48 employees to the

CSF. These contributions ceased in January 1985 when TIME–DC discontinued the special commodities operation. (CSF Ex. 20 at 2).

pension funds, suggested that CSF "formally request additional documentation from both sides of the labor dispute before a final determination be made." CSF solicited additional information by letter of November 19, 1985. TIME–DC's counsel responded by transmitting certain documents to CSF regarding *North Jersey Fund.* On January 9, 1986, TIME–DC's submission was forwarded to TNFINC's counsel for comment. TNFINC's counsel informed CSF that he disagreed with TIME–DC's counsel's legal conclusions. He also advised CSF that TIME–DC would soon be advised of a disclaimer of representation rights by all local unions which had previously been parties to a TIME–DC agreement with the exception of two within the jurisdiction of the Western Conference of Teamsters. (CSF Exs. 29–32). CSF did not transmit a copy of this letter to TIME–DC.

According to CSF, through 1986 CSF staff and house counsel considered the issue of TIME–DC withdrawal liability and finally determined they would recommend that the trustees approve an assessment of withdrawal liability at their April 23, 1986 meeting. At the meeting, the trustees approved the assessment. CSF issued a notice and demand for payment on April 28, 1986.

*Analysis*

TIME–DC is likely to succeed on its claim that on April 23, 1986 it was engaged in a labor dispute with IBT because the evidence demonstrates that there was a controversy pending on that date concerning TNFINC's "representation of persons." By TITAN electronic mail, dated October 24, 1985, Jack Yager, National Director of Freight for IBT, notified IBT locals that, because TNFINC was unaware of the existence of any ongoing representation by locals, TNFINC believed that "Teamster local unions having members formerly employed at T.I.M.E.–DC should disclaim any interest in continuing to represent any T.I.M.E.–DC employees." (TIME–DC Ex. 5). The TITAN continued by requesting that the locals "give authority to the National Negotiating Committee to disclaim any interest on behalf of your local unions to

continue to represent any T.I.M.E.–DC employees." *Id.* By March 4, 1986 letter, Yager notified TIME–DC, through Frank Williamson, one of its Vice-Presidents, of a list of 61 local unions who allegedly had authorized TNFINC to disclaim any interest in representing TIME–DC's employees. (CSF Ex. 15). CSF obtained a copy of the letter and checked the list of locals against CSF's records pertaining to TIME–DC. The check revealed that CSF had received contributions on behalf of a number of locals not listed in the letter. CSF telephoned TNFINC to inquire as to the status of these locals. TNFINC subsequently informed CSF, by letter dated March 31, 1986, that 18 additional locals, including all TIME–DC locals that had prior contribution histories with CSF, had disclaimed interest in representing TIME–DC employees. (CSF Ex. 16). As of March 31, CSF staffers were "certain that all [TIME–DC] locals within the jurisdiction of the [CSF] had disclaimed." (CSF Br. at 32). Yager sent Williamson a copy of this second list.

The general information contained in the letters of March 4 and March 31, among other things, was repeated in an April 9, 1986 letter to TIME–DC's counsel. (CSF Ex. 38). In response to the April 9 letter, TIME–DC's counsel inquired whether the letter meant that TNFINC's prohibition against TIME–DC's bargaining directly with local units was rescinded. (Santucci Dep. Ex. 2, F). In reply, TIME–DC was told, by letter dated April 21, 1986, that two local unions had indicated a desire not to disclaim their interest (*see* Supp.Aff. of Eugene K. Anderson at ¶ 22) and that "the International Union's General Executive Board would consider whether the National Negotiating Committee will cease to act as the aforementioned Local Unions' bargaining agent [and that] the next meeting of the General Executive Board is scheduled for April 28—May 1, 1986." (Santucci Dep. Ex. 2, G).

At this point in time, there remained the question of who TIME–DC was to deal with if it wanted to bargain with its IBT-represented employees. This confusion was perpetuated by a May 8, 1986 letter to

TIME–DC from counsel for TNFINC advising TIME–DC that TNFINC was polling its members for permission to relinquish its authority to represent the locals. (*See* Santucci Dep. Ex. 4). Even correspondence from TNFINC's chairman, Jackie Presser, to his fellow committee members shows that the issue of who represented the local unions had not yet been finally determined. (Santucci Dep. Ex. 3). In a TITAN dated May 4, 1986, six days *after* CSF issued its notice imposing withdrawal liability, Presser informed TNFINC members that

At its meeting May 1, 1986, the General Executive Board interpreted Article XVI, Section 4, of the International Constitution as permitting master committees involved in master agreement bargaining to relinquish entirely, or modify, in whole or in part, its authority as agent for one or more of the involved local unions, with respect to one or more employers involved, under such circumstances and conditions and for such reasons as it, in its sole judgment may determine, subject to appeals to the General Executive Board by any affiliate affected adversely by such action.

Please respond by returr TITAN message to terminal GPLV as to whether you agree to relinquish the National Negotiating Committee's authority to represent those local unions which desire to bargain individual freight industry contracts for their involved members employed by T.I.M.E.–DC, Inc.

*Id.* Until TNFINC agreed to relinquish its authority, the controversy regarding representation, and therefore a labor dispute within the meaning of MPPAA, continued.

The June 11, 1986 letter notified TIME–DC that the poll mentioned in Santucci's

May 8, 1986 letter had been completed and that TNFINC had voted to relinquish its authority to act as agent for the involved local unions. (Santucci Dep. Ex. 4). The June 11 letter continued:

This letter shall serve as notice that the National Negotiating Committee no longer acts as the bargaining agent for those freight Local Unions which have not disclaimed interest (Local Unions 63, 70, 81, 223, 287, 305 and 639) in representing T.I.M.E.–DC's employees for the purposes of collective bargaining.

*Id.* Not until TIME–DC received this notice should TIME–DC have known that, from IBT's viewpoint at least, there was no longer a dispute regarding who represented TIME–DC's employees. This point is emphasized by Santucci's testimony that, as of June 12, 1986, TIME–DC was free to bargain with any IBT local that employed TIME–DC members. (Santucci Dep. at 69). It was the June 11, 1986 action that finally permitted TIME–DC to undertake the local-by-local bargaining that it has sought since late 1981. (Supp.Aff. of Anderson ¶ 18).

Because a dispute regarding representation of the TIME–DC employees continued until at least [11] the June 11, 1986 action of TNFINC, there was, under the terms of 29 U.S.C. § 1398, a labor dispute between TIME–DC and IBT at the time that CSF's trustees voted to impose withdrawal liability against TIME–DC. Because TIME–DC is exempt from assessment of withdrawal liability while pension contributions are suspended by reason of a labor dispute, the assessment was unlawful. The court therefore holds that there is a substantial likelihood that TIME–DC will prevail on the merits of its claim.[12]

**11.** Given the court's disposition of this issue, the court need not, and does not, address the issue whether the dispute has continued past June 11, 1986.

**12.** CSF takes the position, based on prior TIME–DC cases where an injunction has been granted, that a pension fund is entitled to prevail if the decision to impose withdrawal liability was made in good faith and upon some evidence. The court disagrees. In the prior cases, the trustees made their decision to impose with-

drawal liability with little or no investigation of the facts regarding whether there was a pending labor dispute. These holdings cannot be enlarged to stand for the proposition that an assessment of withdrawal liability is legal if it is made after a "full" investigation. Likewise, it is not sufficient that, notwithstanding evidence showing the contrary, there is "some evidence" to support the trustees' decision. A fund must make the correct decision, not an incorrect, but good faith, decision based upon some evidence.

## III.

### IRREPARABLE INJURY

TIME–DC has carried its burden of establishing a substantial threat of irreparable injury if CSF is not enjoined from pursuing its withdrawal liability claim. As Judge McLaughlin concluded in *North Jersey Fund:*

> [TIME–DC] has lost its customers during the protracted strike, and will be unlikely to regain them in the face of a claim for withdrawal liability. Such a claim, whether valid or not, sends a signal to people in the industry that the company in question is out of business.

560 F.Supp. at 304. The IBT strike reduced TIME–DC's net worth from $12 million to only $740,000, its assets from $40 million to only $8 million, and its cash on hand from over $2 million to only a nominal amount. (Anderson Aff. at ¶¶ 59–60). In his affidavit, Eugene K. Anderson, a TIME–DC Vice-President, Treasurer, and Secretary, states unequivocally that "[p]ermitting Central States' claim to proceed would destroy all possibilities that TIME–DC could survive, much less regain its level of prestrike business." (*Id.* at ¶ 64). Additionally, Anderson states that

> [i]f the Fund is permitted to pursue its withdrawal liability claim, the shipping public will have the perception that TIME–DC is out of business or will soon be put out of business by the Teamsters and the pension funds. Shippers will not give their freight to a trucking firm that is perceived as not having financial responsibility or not having sufficient labor stability to provide the promised service.

(*Id.* at ¶ 56). Moreover, according to Anderson, TIME–DC's competitors have displayed an unusual and continuing interest in TIME–DC's relationship with CSF and they will, in Anderson's experience, spread any bad news about the relationship. (*Id.* at ¶ 57). Finally, Anderson also claims that if the court does not enjoin CSF from pursuing its claim for withdrawal liability, then other pension funds, some of which are now voluntarily withholding an assertion of liability, may follow CSF's lead and assert any claims for withdrawal liability.

This could result in claims totaling as much as $30 million. (*Id.* at ¶¶ 64, 66). The assertion of such claims, in whole or in part, would "force TIME–DC out of business and into bankruptcy."

On the other hand, CSF maintains that TIME–DC has $3.4 million in cash or cash equivalents in a "business expansion fund" which TIME–DC can use to pay the interim payments without taking bankruptcy. For this reason, says CSF, there is no immediate threat to TIME–DC. Additionally, CSF takes the position that TIME–DC may not claim that its ability to attract customers will be diminished because it publicly announced in May 1986 that a claim for withdrawal liability had been made against it and, between January 1986 and June 18, 1986, its business has somewhat improved. CSF also contends that there is no reason to believe that other funds will now pursue their liability claims against TIME–DC when they have not done so in the past. Finally, CSF argues that Congress, in enacting MPPAA, balanced the equities in favor of funding pensions at the expense of business rather than preserving business at the expense of pension funds. (CSF Brief at 93–94).

All of TIME–DC's claims, that it will not survive because of its present low net worth, because of the threat to the confidence of its customers, and/or because other funds will now assess withdrawal liability to prevent CSF from receiving all of TIME–DC's limited funds, have been accepted by other district courts as sufficient evidence of irreparable injury. *IAM Fund,* 597 F.Supp. at 264–65; *New York Fund,* 580 F.Supp. at 631–32; and *North Jersey Fund,* 560 F.Supp. at 304.

Additionally, where it is shown that a party is in danger of losing many customers and that if the party loses those customers it will probably be forced out of business, irreparable injury has been established. *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 28 (2d Cir.1978). A threat to the continued existence of a business can constitute irreparable injury. *Id.* at 28–29. *See Ryko*

*Manufacturing Company v. Eden Services,* 759 F.2d 671, 673 (8th Cir.1985), and *Semmes Motors, Inc. v. Ford Motor Company,* 429 F.2d 1197, 1205 (2d Cir.1970).

There can be no question that the assessment, and subsequent enforcement, of withdrawal liability threatens TIME–DC's very existence. CSF's contention that TIME–DC can make interim payments from its business expansion fund is unpersuasive. If TIME–DC is forced to make the interim payments, it will only be a matter of time before TIME–DC is out of business with virtually no hope of recovery. Furthermore, the other injuries noted above will nevertheless occur even though liability has been imposed in installments.

This court does not construe the irreparable injury requirement of *Canal Authority* so narrowly as to prohibit a court from protecting against those consequences that are irreversible but which may not befall the preliminary injunction movant the instant the motion is denied. Nothing in the *Canal Authority* test expressly mandates a showing of immediate harm. The focus of *Canal* is instead on the severity of the harm and its irreparability.[13]

CSF's contention that TIME–DC has itself brought on the harm of lost customer confidence and other fund assessments by publicly announcing the CSF assessment misapprehends the true facts. Although TIME–DC did publicly acknowledge CSF's claim, TIME–DC also stated that it intends to "vigorously contest this demand." (CSF Ex. 45). Moreover, until now TIME–DC has been able to point to the various injunctions it has obtained to reassure its clientele that the imposition of withdrawal liability is, at least for now, unlikely. If the barrier of injunction is removed, TIME–DC will not be able to make such a claim and the probability increases significantly that its customers will do less business, or no business at all.

As to the likelihood that other funds will assess liability against TIME–DC if CSF's assessment is allowed to stand, the court finds persuasive TIME–DC's argument that the injunctions granted in the other TIME–DC cases have been a major, if not the sole, factor in slowing the enthusiasm of other funds to assess withdrawal liability. There is a rational basis for TIME–DC's contention that, absent injunctive relief, other funds will not sit idly by as CSF devours TIME–DC's assets.

Finally, the issue whether Congress has balanced the equities in favor of employer-businesses or in favor of pension funds need not be reached. The issue presumes a *legal* assessment of withdrawal liability. As it now stands, it is probable that CSF's assessment was not legal because it was made at a time when TIME–DC was involved in a labor dispute.

## IV.

### HARM TO CSF

CSF first asserts it will be harmed if an injunction is granted because it will not receive the interim withdrawal payments to which it maintains it is entitled during the pendency of this litigation. CSF bases its assertion on the general policy argument that, by enacting MPPAA, Congress intended pension funds to be able to collect interim payments. CSF does not, however, attempt to quantify the amount of interim payments it will not receive during the pendency of this litigation, but instead generally points to the fact that it has unfunded, vested liabilities of $3.021 billion. There is not even a suggestion that claims will be made against CSF during the pendency of this litigation which CSF will not be able to meet with the $6 billion in assets it now has.

CSF next argues that it will be harmed if the court grants an injunction because TIME–DC will dissipate its assets during the pendency of this litigation. CSF's allegations regarding this issue deal with events that occurred primarily in 1981 and 1982. Without considering the merits of

---

**13.** CSF cites *Harris v. Wilters,* 596 F.2d 678 (5th Cir.1979), for the proposition that the injury must be immediate. No portion of *Harris,* however, deals expressly with the issue of immediacy.

what occurred 4–5 years ago, CSF has offered no probative evidence that TIME–DC is *now* trying to put its assets out of CSF's reach. In contrast, TIME–DC has presented evidence that it has been working to increase its assets and its net worth. Thus, the court holds that any harm to CSF is purely speculative. Even if the court gives credence to CSF's argument, the harm to CSF is insignificant compared to the harm to TIME–DC if the injunction is not granted.

## V.

### PUBLIC INTEREST

The sole issue regarding the final *Canal Authority* factor is whether the public's interest in the economic viability of pension plans is such that it overrides both the probability that TIME–DC will be forced out of business if an injunction is not granted and the equally strong likelihood that the assessment against TIME–DC was made in violation of MPPAA. To be sure, the primary interest that MPPAA protects is the financial integrity of pension funds and, in turn, workers who rightfully expect to receive their pensions; however, MPPAA also protects employers against withdrawal liability during a labor dispute. The court concludes that the public's interest in the economic viability of CSF is not now threatened and that the public's interest in not having withdrawal liability assessed during a labor dispute has, in all likelihood, been violated by CSF. Accordingly, the court holds that in this case the *Canal* public interest factor weighs in favor of TIME–DC.

## VI.

### ARBITRATION

■ CSF moves to dismiss Count I of TIME–DC's counterclaim, and argues that the court should not grant a preliminary injunction, on the ground that the dispute over assessment of withdrawal liability must be arbitrated. As a general rule a party must exhaust its administrative remedies before it can invoke the jurisdiction of the courts. *Myers v. Bethlemen Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct.

459, 463–64, 82 L.Ed. 638 (1938). Sections 1401(a) and (d) of MPPAA require the parties to resolve "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399" by arbitration and that scheduled payments of that liability continue during that process. Congress, in enacting MPPAA, expressed a clear preference for self-regulation through arbitration. 29 U.S.C. § 1401(a)(1).

■ Nevertheless, there is an exception to the exhaustion doctrine applicable to the instant case. Exhaustion is not required when the nonjudicial remedy is clearly shown to be inadequate to prevent irreparable injury. *Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 293 (3d Cir. 1982). The injury required to avoid the arbitration process is the same injury required for issuance of a preliminary injunction. *New York Fund*, 580 F.Supp. at 633. Because TIME–DC has established irreparable injury in the preliminary injunction context, it has also established irreparable injury sufficient to avoid arbitration.

CSF argues in response that the time, expense, and effort associated with arbitration of MPPAA withdrawal liability does not constitute irreparable injury, citing *Terson Co. v. Pension Benefit Guaranty Corp.*, 565 F.Supp. 203, 207–08 (N.D.Ill. 1982). *Terson* is distinguishable from the present case. In *Terson*, the employer contended only that if it did not make periodic payments of its withdrawal liability, the trustees could declare a default and if a default were declared it could be liable for the delinquent amount, interest, damages, attorneys' fees, and costs. *Id.* at 206. There was no claim that if Terson were required to pay these various fees and costs during the pendency of the arbitration Terson's existence and customer base would be seriously threatened. This is a significant difference. TIME–DC is not merely asserting "time, expense and effort spent in pursuing an action in an available forum [which] is a consequence of living in

society;" *id.;* it has alleged that it will not, in all probability, survive as a business entity if forced to go through arbitration or if a preliminary injunction is denied. It is incongruous to reason that TIME–DC *will* be irreparably injured if a preliminary injunction is not granted but will *not* be irreparably harmed if the dispute is arbitrated without the issuance of an injunction. This is especially so given the recent holdings that withdrawal liability payments must be made while a dispute is in arbitration. *E.g., United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 134 (3d Cir.1986). For these reasons, the Central States Fund's June 10, 1986 motion to dismiss count I of TIME–DC's counterclaim is denied and the court rejects CSF's contention that this dispute must be arbitrated.

### VII.

By separate order, the court today issues a preliminary injunction in favor of TIME–DC for the reasons stated in this opinion.