**CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Plaintiff-Appellant.**

v.

**T.I.M.E.–DC, INC., Defendant-Appellee.**

No. 86–1628.

United States Court of Appeals, Fifth Circuit.

Aug. 24, 1987.

Robert D. Manfred, Charles O'Connor, Washington, D.C., for plaintiff-appellant.

Peter H. Gould, J. Stephen Caflish, Sp. Counsel, Pension Benefit Guar. Corp., David F. Power, Washington, D.C., Mullinax, Wells, Baab & Cloutman, Roger Albright, Dallas, Tex., for amicus Pension Benefit Guar. Corp.

Carl L. Taylor, Jeffrey S. Davidson, Michael E. Baumann, Kirkland & Ellis, Washington, D.C., for T.I.M.E.–DC, Inc.

Before RANDALL, GARWOOD and DAVIS, Circuit Judges.

RANDALL, Circuit Judge:

The Central States, Southeast and Southwest Areas Pension Fund ("CSF") appeals the district court's issuance of a preliminary injunction against CSF's assessment of withdrawal liability against T.I.M.E.–DC, Inc. ("TIME–DC"), 639 F.Supp. 1468. Finding that TIME–DC did not make a showing of irreparable injury sufficient to excuse its failure to exhaust administrative remedies, we reverse.

## I.

The central issue in this appeal is the importance of arbitration as the congressionally mandated first recourse in litigation concerning the assessment of withdrawal liability pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1381, *et seq.* ("MPPAA"). In order to fully develop the factual and procedural posture in which this appeal is presented, we will first engage in a brief overview of ERISA as amended by the MPPAA, then examine the labor dispute engendering the instant litigation, and, finally, review the proceedings below.

### A. An Overview of the Statute

Congress enacted ERISA in 1974 to comprehensively regulate private pension plans. Congress's intention "was to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans. Congress wanted to guarantee that 'if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.' " *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984) (citations omitted) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980)).

In the late 1970s, "Congress became concerned that a significant number of [multiemployer] plans were experiencing extreme financial hardship," *id.* at 721, 104 S.Ct. at 2713, and that the imminent application of ERISA to multiemployer plans "might induce several large plans to terminate, thus subjecting [ERISA's pension] insurance system to liability beyond its means." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 215, 106 S.Ct. 1018, 1021, 89 L.Ed.2d 166 (1986). Con-

gress perceived that "existing law, and particularly the provisions [of ERISA] governing plan termination insurance, do nothing to strengthen financially weak plans, and in some cases may actually cause further deterioration of a plan's financial condition and create incentives to terminate a plan in financial difficulty." H.R.Rep. No. 869, 96th Cong., 2d Sess. 51, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2919. Congress's eventual response was the MPPAA, which sought to reduce the burden of employer withdrawals upon a plan and remaining employers by requiring "that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of the vested benefits and the current value of the plan's assets." *Gray*, 467 U.S. at 725, 104 S.Ct. at 2715.

The MPPAA places the responsibility on plan sponsors of determining when withdrawal has taken place, assessing the amount of withdrawal liability, notifying the employer, and collecting the amount due. *See* 29 U.S.C. §§ 1382, 1399(b)(1). "On timely request, the plan sponsor is obliged to review and explain any aspect of the withdrawal liability determination questioned by the employer." *Grand Union Co. v. Food Employers Labor Relations Ass'n*, 808 F.2d 66, 68 (D.C.Cir.1987) (citing 29 U.S.C. § 1399(b)(2)). "If informal review does not resolve the differences between plan sponsor and employer, the statute commands arbitration: 'Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title, [*i.e.*, the prescriptions on establishment, calculation, and collection of withdrawal liability] shall be resolved through arbitration.' " *Id.* (quoting 29 U.S.C. § 1401(a)(1)). The plan sponsor's withdrawal liability determination is presumed correct under the statute, a presumption that the employer may rebut upon a showing "by a preponderance of the evidence that the determination was unrea-

sonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). A party to the arbitration may seek judicial review of the arbitral award, but, in court, the arbitrator's findings of fact are presumed correct unless rebutted by a clear preponderance of the evidence. 29 U.S.C. § 1401(b)(2), (c).

### B. The Labor Dispute and CSF's Withdrawal Assessment

In 1981, TIME–DC's longstanding, nation-wide trucking operation felt the pinch of the recent deregulation of the trucking industry. Stating that it could no longer effectively compete with new, non-unionized trucking companies, TIME–DC notified the Teamsters National Freight Industry Negotiating Committee ("TNFINC") that it wished to negotiate a contract tailored to TIME–DC's particular needs, preferably by individual negotiations with each local International Brotherhood of Teamsters ("Teamsters") union. Through the period of deregulation, labor arrangements in the trucking industry were governed by a series of collective bargaining agreements negotiated on one side by TNFINC, acting as the exclusive agent for Teamsters locals, and on the other side by a multiemployer bargaining group representing a wide array of freight companies. Pursuant to such agreements, TIME–DC was obligated to make payments to pension funds such as CSF. Thus, in 1981, TIME–DC broke away from the multiemployer group in the hope of cutting labor costs by negotiating bilaterally with TNFINC, or through a series of negotiations with the local unions.

TNFINC was hardly receptive to this challenge to its national bargaining authority. Negotiations between TIME–DC and TNFINC quickly broke down, and a strike called by TNFINC against TIME–DC in April of 1982 immobilized TIME–DC's general commodities operation. Within weeks, TIME–DC shut down 80 or 85 of the approximately 100 terminals that it operated, removed office furniture and operating equipment, and, by May 1982, released its entire sales staff. In August of that year, the Teamsters made an unconditional offer to return to work. Nonetheless, TIME–DC recommenced only a fraction of its former operations, opening a limited, special commodities operation on the West Coast. TNFINC informed TIME–DC in December, 1982, that it desired to resume negotiations. The two parties negotiated face-to-face twice in 1983, and exchanged letters in 1984, but neither side was willing, it seems, to concede to the essential demands of the other.

Beginning in 1983, a number of multiemployer plan sponsors, for one reason or another, took TIME–DC's substantial reduction or cessation of contributions to the pension plans as a withdrawal from their plans, and assessed withdrawal liability against TIME–DC. Because many of these funds had not followed the proper procedures in assessing liability [1] or had operated in a biased manner,[2] and all had failed to give adequate consideration to the MPPAA's "labor dispute exception," [3] TIME–DC was able to obtain district court injunctions against the withdrawal liability assessments without first arbitrating the disputes.

Sometime in 1985, TNFINC seemed to lose hope in negotiations with TIME–DC, and commenced the process of ending the labor dispute with TIME–DC in order to clear the way for the proper assessment of withdrawal liability by the funds. In October, 1985, TNFINC polled its TIME–DC locals to determine whether they were willing to disclaim further interest in representing TIME–DC employees. The parties before this court agree that, according to

---

**1.** See *T.I.M.E.–DC, Inc. v. New York State Teamsters Conf. Pension & Retirement Fund,* 580 F.Supp. 621, 630 (N.D.N.Y.), *aff'd,* 735 F.2d 60 (2d Cir.1984) (per curiam); *T.I.M.E.–DC, Inc. v. Trucking Employees of North Jersey Welfare Fund, Inc.,* 560 F.Supp. 294, 303 (E.D.N.Y.1983).

**2.** See *Trucking Employees of North Jersey Welfare Fund,* 560 F.Supp. at 303.

**3.** See *T.I.M.E.–DC, Inc. v. Western Conf. of Teamsters Pension Fund,* 7 Employee Benefits Cas. (BNA) 2124 (N.D.Cal.1986); *T.I.M.E.–DC, Inc. v. I.A.M. Nat'l Pension Fund,* 597 F.Supp. 256, 263 (D.D.C.1984); *New York State Teamsters Conf. Pension & Retirement Fund,* 580 F.Supp. at 631; *Trucking Employees of North Jersey Welfare Fund,* 560 F.Supp. at 303.

the applicable labor laws, a union may unilaterally end a labor dispute by disclaiming all interest in representing the workers in question.

At an October 22–23, 1985, meeting, the CSF trustees received a report on the status of the TIME–DC situation which concluded that the TIME–DC/Teamsters labor dispute was "over or will continue forever" and, based on the prior TIME–DC cases, suggested that CSF "formally request additional documentation from both sides of the labor dispute before a final determination is made." CSF made such a request and received a reply from TIME–DC, which CSF forwarded to TNFINC for comment. CSF did not forward a copy of TNFINC's response to TIME–DC.

As 1986 began, TNFINC's polling of its locals proceeded. By a letter dated March 4, 1986, the Teamsters sent TIME–DC a list of 61 local unions that had disclaimed interest in representing TIME–DC employees. CSF received a copy of the letter and checked this list against a master list of TIME–DC locals on whose behalf TIME–DC had contributed to CSF. Finding a number of contributing locals that did not appear on the list, CSF contacted TNFINC and inquired as to the status of these local unions. TNFINC responded, by letter dated March 31, 1986, that 18 additional local unions, including all TIME–DC locals that had prior contribution histories with CSF, had disclaimed interest in representing TIME–DC employees. As of March 31, the CSF staff was "certain that all [TIME–DC] locals within the jurisdiction of [CSF] had disclaimed."

The general information contained in the letters of March 4 and March 31 was repeated in an April 9, 1986, letter to TIME–DC's counsel. In response to this letter, TIME–DC inquired whether the letter meant that TNFINC had rescinded its prohibition against TIME–DC's bargaining directly with local unions. In reply, TIME–DC was told, by a letter dated April 21, 1986, that two local unions had indicated a desire not to disclaim their interest and that the national Teamsters would soon decide whether TNFINC would cease to act

as the bargaining agent of these local unions.

On April 23, 1986, CSF determined that the labor dispute had ended with respect to the locals within its jurisdiction, and assessed withdrawal liability against TIME–DC.

By a May 8, 1986, letter to TIME–DC, TNFINC informed the former that it was polling its members for permission to relinquish its authority to represent the locals in question. A letter dated June 11, 1986, informed TIME–DC that the poll had been completed and that TNFINC had voted to relinquish its authority to act as agent for the local unions concerned.

### C. Proceedings Below

On April 15, 1986, CSF, together with another Teamsters fund and a trustee of both funds, filed a complaint in the United States District Court for the Northern District of Texas to collect TIME–DC's delinquent contributions. TIME–DC filed an answer and a counterclaim seeking a declaratory judgment and injunctive relief against the threat of CSF's prosecution, enforcement, or collection of a claim made against TIME–DC for $18,432,748.84 in withdrawal liability under the MPPAA. TIME–DC asserted that it was exempted under the labor dispute exception to the act. TIME–DC also brought a host of constitutional, fiduciary, and civil RICO claims against the fund.

In late May, TIME–DC applied for a temporary restraining order to preclude CSF from prosecuting the withdrawal liability assessment, which the district court granted. After considering the substantial brief and documentation offered in support of TIME–DC's motion for a preliminary injunction, the district court found that the requirements for such an injunction had been satisfied, and granted the preliminary injunction on July 25, 1986. *Central States, S.E. & S.W. Areas Pension Fund v. T.I.M.E.–DC, Inc.*, 639 F.Supp. 1468 (N.D.Tex.1986).

First, the district court found that TIME–DC was likely to succeed on the merits. Noting that the term "labor dis-

pute" is not defined in the MPPAA, the court followed the lead of the other courts involved in TIME–DC litigation and gave that term the same definition as is found, with slight or no variation, in the NLRA, the LMRA, and the Norris-LaGuardia Act. *Id.* at 1471–72. For the purposes of the litigation before it, the court focused on that portion of the statutory definition of "labor dispute" that included

> any controversy concerning ... the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment.

*E.g.,* 29 U.S.C. § 152(9) (NLRA).

Concentrating on the exchange of letters between TNFINC and TIME–DC that occurred after April 23, the court concluded "that TIME–DC and [the Teamsters] were still in a labor dispute, albeit perhaps its last vestiges, on April 23, 1986, and at that time the CSF trustees lacked a legal basis under MPPAA to assert withdrawal liability." 639 F.Supp. at 1472. Because the question of who represented the handful of local unions that had not disclaimed interest was not resolved until TNFINC rescinded its power to act as their agent by the June 11, 1986, letter, a dispute as to representation existed at least until that date. *Id.* at 1475.

Second, the court concluded that TIME–DC had established a substantial threat of irreparable injury. TIME–DC asserted, and the district court accepted, that the size of the liability judgment assessed would put it out of business, the mere fact of assessment would scare off its customers, and that the assessment would encourage other funds to assess withdrawal liability and put TIME–DC out of business. *Id.* at 1476–77.

Third, the court weighed the harm to CSF as being relatively slight. Although CSF has unfunded, vested liabilities of $3.021 billion, there was no suggestion that these claims would be made during the pendency of the litigation. *Id.* at 1477. The court dismissed CSF's assertions, based on TIME–DC's questionable behavior in the earlier litigation, that TIME–DC would try to dissipate its assets, as not founded on present acts of TIME–DC.

Fourth, the court found that the public interest would be served by maintaining the viability of TIME–DC, especially in light of the substantial likelihood that TIME–DC would prevail on the merits. *Id.* at 1478.

Finally, the court disposed of CSF's claim that the dispute must be arbitrated. Treating the arbitration provision of the act as an administrative remedy rather than a jurisdictional prerequisite, the court noted the exception to the requirement of exhaustion of administrative remedies when the nonjudicial remedy is clearly shown to be inadequate to prevent irreparable injury. Since TIME–DC had already proven irreparable injury in the context of the preliminary injunction, it had also demonstrated the administrative remedy of arbitration to be inadequate. *Id.*

On appeal, CSF argues first and foremost that the district court erred in failing to require TIME–DC to arbitrate its dispute with CSF, presenting two alternative arguments in support of this proposition. CSF asserts first that arbitration is a jurisdictional prerequisite to district court review of a plan sponsor's withdrawal liability assessment, and the court below therefore lacked jurisdiction to entertain that portion of TIME–DC's counterclaim challenging the merits of the assessment. Alternatively, CSF argues that, even if arbitration is not a jurisdictional prerequisite, the district court nonetheless should have required arbitration because TIME–DC failed to establish an exception to the prudential requirement of exhaustion of administrative remedies. CSF also argues that the court below erred in reviewing *de novo* the trustees' determination of withdrawal liability, and, in particular, in basing its decision on the merits in part upon facts developed after the determination was made. Finally, CSF assails the district court's finding of a substantial likelihood of success on the merits.

Appearing before this court as an *amicus curiae*, the Pension Benefit Guaranty Corporation ("PBGC") supports two of

CSF's contentions. First, PBGC agrees with CSF that the court below had no basis for finding that compliance with the statutory arbitration procedures would cause TIME–DC irreparable harm. Second, PBGC argues that the district court misinterpreted and misapplied the MPPAA's "labor dispute" exemption, and that the court's finding of a substantial likelihood of success on the merits was consequently flawed.

TIME–DC responds that the district court's findings are entitled to deference by this court unless "clearly erroneous," and that, in this case, the district court's rulings were justified by the record. Noting that no circuit that has considered the question has concluded that arbitration is a jurisdictional prerequisite, TIME–DC argues that Congress did not intend arbitration to be such a prerequisite in actions brought under the MPPAA. Because the district court's finding of irreparable injury was not clearly erroneous, TIME–DC argues, this court must affirm the order of the district court.

## II.

The first question before this court is whether the district court erred in refusing to require arbitration of TIME–DC's statutory counterclaim. As noted above, this question divides into two independent and alternative parts: is arbitration under the MPPAA a jurisdictional prerequisite to district court jurisdiction, and, if not, was TIME–DC's failure to exhaust administrative remedies excused by an exception to that "prudential" doctrine?

In responding to these questions, it is important to note that the grounds upon which TIME–DC's motion for a preliminary injunction is based are considerably more narrow than the grounds for relief contained in its counterclaim. While the counterclaim alleges that the MPPAA, as ap-

plied, is unconstitutional, and further alleges that CSF breached its fiduciary duty, violated the Racketeer Influenced and Corrupt Organizations Act, and misapplied the labor dispute exemption to the MPPAA, the motion for preliminary injunction is based solely upon the ground that CSF's assessment of withdrawal liability contravenes the MPPAA's labor dispute exemption. Thus, we do not have before us the difficult question of the constitutionality of the MPPAA's presumption that the plan sponsor's withdrawal liability determination is correct, *see United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128 (3d Cir.1986), *aff'd without opinion by an equally divided Court,* — U.S. ——, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987), and, for the purposes of this appeal, we assume the constitutionality of the statute.[4] We now address the questions posed *seriatim.*

### A.

■ CSF argues that Congress intended arbitration to be a prerequisite to district court jurisdiction over disputes required to be arbitrated under 29 U.S.C. § 1401. Congress created a carefully integrated system for the resolution of disputes concerning withdrawal liability, CSF notes. That process begins with assessment of liability, *see* 29 U.S.C. §§ 1382, 1399(b)(1), develops further with the plan sponsor's response to an employer's request for review of its determination, *see* 29 U.S.C. § 1399(b)(2), and culminates in "compulsory arbitration." *Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980,* 96th Cong., 2d Sess., *reprinted in* 126 Cong.Rec. 20,189, 20,198 (1980) (primarily authored by Senators Long and Williams); *see* 29 U.S.C. § 1401. That a district court may not interlope in this carefully integrated process, CSF argues, is

---

4. In one of a series of unsolicited letter briefs, TIME–DC, while acknowledging that the Court's action in *Yahn & McDonnell* has no precedential value, urges us to take jurisdiction of and decide the constitutional issues presented in its counterclaim, even though such issues were never advanced as a basis for the order before us on this interlocutory appeal. Because these issues were neither presented to the district court nor addressed in the briefs on this appeal, and because the degree of factual development necessary to substantiate such claims remains unclear, we decline to address the constitutional questions at this juncture.

demonstrated by the compulsory language of the arbitration provision:

> Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title *shall be* resolved through arbitration.

29 U.S.C. § 1401(a)(1) (emphasis added). Finally, CSF points to section 1401(b)(2), which provides for district court review of arbitral awards entered pursuant to the MPPAA:

> Upon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action, no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court in accordance with section 1451 of this title to enforce, vacate, or modify the arbitrator's award.

29 U.S.C. § 1401(b)(2). Underlining the clause "upon completion of the arbitration proceedings," CSF argues that this provision clearly indicates Congress's intention to make completion of the arbitral process a jurisdictional prerequisite to review in the district court. Thus, contrary to the district court's analysis, arbitration is a jurisdictional condition to district court review and not merely a requirement of exhaustion of administrative remedies. Being a prerequisite to jurisdiction, the failure to arbitrate in this case deprived the district court of subject-matter jurisdiction over the counterclaim, and therefore could not be excused by any showing of irreparable injury. The district court therefore erred, CSF concludes, in failing to dismiss the MPPAA-based counts of TIME–DC's counterclaim for lack of jurisdiction.

Courts have recognized that Congress may, in enacting an administrative review system, vest exclusive original jurisdiction in the reviewing agency by specifically excluding judicial review of questions submitted to the agency from broader grants of federal judicial jurisdiction, such as, for example, federal question jurisdiction under 28 U.S.C. § 1331. *See, e.g., Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975); *Town-*send v. U.S. Dep't of Justice Immigration & Naturalization Serv., 799 F.2d 179, 181 (5th Cir.1986). For example, in *Salfi*, the Supreme Court found that the following statutory language indicated a congressional intention to provide judicial jurisdiction over Social Security determinations only after the parties exhausted the administrative remedies:

> The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decisions of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h). Because of the above provision's clear, exclusionary language, the Court found exhaustion of administrative remedies to be a statutorily mandated jurisdictional prerequisite rather than an acknowledgment of the "prudential," judicial doctrine requiring such exhaustion: "That the third sentence of § 405(h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that *no* action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted." *Salfi*, 422 U.S. at 757, 95 S.Ct. at 2463 (emphasis in original).

Similarly, in *Townsend*, we interpreted clearly exclusionary statutory language as barring judicial jurisdiction unless and until a petitioner challenging a deportation order exhausted his administrative remedies. 799 F.2d 179. The statute in question in *Townsend* provided that "[a]n order of deportation ... *shall not be reviewed by any court if the alien has not exhausted the administrative remedies* available to him as of right under the immigration laws and regulations." 8 U.S.C. § 1105a(c) (emphasis added). Noting that "[w]hen exhaustion is statutorily mandated, the require-

ment is jurisdictional," 799 F.2d at 181, we found that the petitioner had not exhausted such remedies and therefore dismissed the appeal for lack of jurisdiction. *Id.* at 182.

The statute *sub judice*, however, contains no language similarly indicating a congressional intent to vest original jurisdiction exclusively in the arbitral tribunal envisaged by the MPPAA. Section 1401(b)(2), quoted *supra*, merely provides for district court review of an arbitral award; it contains no language tending to exclude district court jurisdiction that would otherwise be available. Likewise,

section 1401(a)(1)'s provision that withdrawal liability questions "shall be resolved through arbitration" simply indicates that arbitration is a compulsory, not a voluntary, stage of the administrative procedure. Again, nothing in section 1401(a)(1) indicates a congressional intention to exclude district court jurisdiction. Our review of the section's scant legislative history has not convinced us otherwise.[5] Nor has our review of other administrative schemes in which Congress has mandated arbitration convinced us that our reading of section 1401 is aberrant.[6] We therefore conclude,

---

**5.** Perhaps because the arbitration provision was not added until late in the legislative process, it received little comment. As reported out of the relevant committees, neither the House nor the Senate bill contained an arbitration provision. *See* Senate Comm. on Labor & Human Resources, 96th Cong., 2d Sess., *The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration* 167–250 (Comm. Print 1980) (reporting S. 1076 as amended by the Committee); H.R.Rep. No. 869, 96th Cong., 2d Sess. 2–50 (1980) (same with respect to H.R. 3904). H.R. 3904, when it passed the House on May 22, 1980, did not contain an arbitration provision. *See* 126 Cong. Rec. 12,180–224 (1980) (text of H.R. 3904, as amended). What is currently 29 U.S.C. § 1401 appeared for the first time as § 4221 of ERISA on July 29, 1980 in a proposed Senate amendment to the House bill. *See id.* at 20,157. In a joint explanation entered into the Congressional Record on that date, the arbitration provision received the following brief comment:

> 15. Employer challenge to a plan's determination of withdrawal liability or unfunded vested benefits.
> Under the bill, an employer is permitted to challenge a plan's determination of withdrawal liability or of unfunded vested benefits. Such disputes are subject to compulsory arbitration. In the resolution of the dispute, the plan is treated as having met its burden of proof with respect to its unfunded vested benefits if certain standards are satisfied. Pending the resolution of the dispute, the employer is required to pay withdrawal liability as originally determined by the plan, but the failure to pay an installment before the arbitration is concluded would not accelerate payment of future installments. Any party to the arbitration may bring an action in the United States district court to enforce, vacate or modify the arbitrator's award. In the court proceeding, there is to be a rebuttable presumption that the arbitrator's findings of fact were correct.

*Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980,* 96th Cong., 2d Sess., *reprinted in* 126 Cong.Rec. 20,-189, 20,198 (1980) (primarily authored by Sena-

tors Long and Williams). The Senate amendment to the House bill was passed on July 29, 1980.

Some of the Senate amendment's provisions were poorly received in the House, which viewed such provisions as "nongermane." *See* 126 Cong.Rec. 20,842–43 (statements of Reps. Thompson and Erlenborn). On August 1st, Representative Thompson, the House manager of the bill, introduced an amendment to the Senate amendment that would have essentially restored the bill to the form in which it had originally passed the House, and which would have deleted the arbitration provision. *See id.* at 20,974–75 (proposing a § 4221 that would merely create a "presumption regarding determination of withdrawal liability"). No vote was taken on the proposed amendment that day, however. When a reconvened House again met on August 25th to discuss the proposed amendment, the amendment at that time put forward by Representative Thompson left intact the arbitration provision contained in the Senate amendment. *See id.* at 23,017. Thompson briefly and indirectly endorsed the arbitration provision in his opening statement, *id.* at 23,038, and the provision received no further congressional comment.

**6.** Congress has not often employed arbitration as a dispute-resolution mechanism in its administrative schemes. One instance in which Congress has so employed arbitration is in the enforcement of legislation regulating vending facilities for the blind in federal buildings. *See* 20 U.S.C. §§ 107d–1, 107d–2. This legislation, popularly known as the Randolph-Sheppard Act, is designed to provide employment opportunities on federal property to blind vendors. *Randolph-Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 93 (D.C.Cir.1986). Under the Act, designated state agencies license blind vendors to operate a vending facility on federal property. 20 U.S.C. § 107a(a)(5); 34 C.F.R. § 395.7. The state agencies then apply to federal agencies for permits to establish sites on federal property for the state-licensed blind vendors. 20 U.S.C. § 107a(c); 34 C.F.R. § 395.-

in accord with our sister circuits, that the MPPAA's exhaustion of administrative remedies requirement is not jurisdictional. *See I.A.M. Nat'l Pension Fund Benefit Plan v. Stockton TRI Indus.*, 727 F.2d 1204, 1208 (D.C.Cir.1984) ("Only when Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision ... has the Supreme Court held that exhaustion is a jurisdictional prerequisite. Because Congress has not clearly stated in MPPAA that a court cannot decide an issue without first requiring arbitration, we conclude that arbitration under MPPAA is not a statutorily specified jurisdictional prerequisite.") (footnote omitted); *T.I.M.E.–DC Inc. v. Management-Labor Welfare & Pension Funds*, 756 F.2d 939, 945 (2d Cir.1985) ("the arbitration provisions of the MPPAA do not constitute a bar to federal jurisdiction. Rather, the requirement of exhaustion of administrative remedies in this context is a prudential matter within our discretion."); *see also Marvin Hayes Lines v. Central States, S.E. & S.W. Areas Pension Fund*, 814 F.2d 297, 300 (6th Cir.1987) ("Unless an employer is mounting a facial constitutional attack *or making a verifiable claim of irreparable injury,* the courts have no jurisdiction to entertain the merits of the dispute prior to arbitration.") (emphasis added); *Republic Indus. v. Central Pa. Teamsters Pension Fund*, 693 F.2d 290, 292–98 (3d Cir.1982) (analyzing applicability of exceptions to prudential exhaustion doctrine).

**B.**

■ Our inquiry, of course, does not end there, for the prudential requirement that administrative remedies be exhausted "applies even in the absence of an express statutory command of exclusiveness." *McClendon v. Jackson Television, Inc.*, 603 F.2d 1174, 1176 (5th Cir.1979). In general, this "long settled rule of judicial administration [mandates] that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). The exhaustion requirement furthers many important legislative and administrative policies, such as the following: (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the

---

16, .35. If a blind licensee is dissatisfied with state agency action, his recourse, like that of an employer under the withdrawal liability provisions of the MPPAA, is twofold: first the licensee may ask the agency to reconsider and hold a full evidentiary hearing, and second, if dissatisfied with the result of that process, he may demand that the Secretary of Education convene an arbitral tribunal. 20 U.S.C. § 107d–1(a). The Act also provides that a state licensing agency dissatisfied with federal agency action may similarly demand that the Secretary convene an arbitral tribunal. *Id.* § 107d–1(b). The tribunal's decision is final and binding upon all parties, *id.* § 107d–1, and is "subject to appeal and review as a final agency action" under the Administrative Procedure Act, *see* 5 U.S.C. ch. 7. The United States Court of Appeals for the District of Columbia Circuit held this arbitration process to be mandatory rather than voluntary, as we have held that of the MPPAA to be, and ruled that exhaustion of administrative remedies was required before federal court review would be available. *See Randolph-Sheppard Vendors*, 795 F.2d at 103–04. The court went on to examine whether an exception to the exhaustion requirement applied in that case,

thereby implying that arbitration was not a jurisdictional prerequisite but a prudential one. *See id.* at 104–11.

The United States Code also mandates arbitration as a mechanism for resolving certain federally regulated labor disputes. *See* Railway Labor Act, 45 U.S.C. § 157. The mechanisms set up under such provisions do not parallel that of the MPPAA, however, because of the applicability of the Norris-LaGuardia Act to such labor disputes. *See* Norris-LaGuardia Act, 29 U.S.C. § 108 ("No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law ..., or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."); *Brotherhood of R.R. Trainmen v. Toledo, P. & W. R.R.*, 321 U.S. 50, 56, 64 S.Ct. 413, 417, 88 L.Ed. 534 (1944) (29 U.S.C. § 108 deprives federal court of power to issue injunction where parties have not arbitrated in accordance with provisions of Railway Labor Act).

administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that "frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures." *Patsy v. Florida Int'l Univ.*, 634 F.2d 900, 903 (5th Cir. Jan. 1981) (en banc) (quoting *McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969)), *rev'd and remanded on other grounds sub nom., Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). "Like most judicial doctrines, the requirement of exhaustion of administrative remedies is subject to numerous practical exceptions which result from the efforts of the courts to balance the rights of the claimants against the substantial policy factors favoring the rule." *Id.* These exceptions apply, however, only in extraordinary circumstances. *Republic Indus. v. Central Pa. Teamsters Pension Fund*, 693 F.2d 290, 294 (3d Cir.1982).

In the instant case, the district court ruled that TIME–DC was not required to arbitrate because it had demonstrated that "the nonjudicial remedy [was] clearly ... inadequate to prevent irreparable injury." 639 F.Supp. at 1478; *see Lewis v. Reagan*, 660 F.2d 124, 127 (5th Cir. Oct. 1981) ("Parties may resort to the courts without exhaustion ... when irreparable injury is likely to result absent immediate judicial review."); *cf. Patsy*, 634 F.2d at 903 (exhaustion not required when "the [administrative] remedy would be so unreasonably delayed as to create a serious risk of irreparable injury"). CSF and PBGC both argue that the district court's finding of irreparable injury in this case is erroneous. TIME–DC applauds the district court's reasoning, and characterizes the arguments of CSF and PBGC as assertions that the potential harm alleged was not immediate enough to warrant injunctive relief—a proposition which, TIME–DC argues, is unsupported by this circuit's preliminary injunction jurisprudence.

The court below based its finding of a substantial threat of irreparable injury upon three factual predicates. First, the court found that the Teamsters strike had greatly reduced TIME–DC's assets and net worth and had left the company in a precarious financial position. *See* 639 F.Supp. at 1476, 1477. Second, the court agreed with TIME–DC that " '[i]f [CSF] is permitted to pursue its withdrawal liability claim, the shipping public will have the perception that TIME–DC is out of business or will soon be put out of business by the Teamsters and the pension funds. Shippers will not give their freight to a trucking firm that is perceived as not having financial responsibility or not having sufficient labor stability to provide the promised service.' " *Id.* (quoting affidavit of Eugene K. Anderson, TIME–DC Vice President, Treasurer, and Secretary). Third, the court found that "if this court does not enjoin CSF from pursuing its claim for withdrawal liability, then other pension funds, some of which are now voluntarily withholding an assertion of liability, may follow CSF's lead and assert any claims for withdrawal liability." *Id.* at 1476, 1477.

Central to our decision on this question is a precise understanding of what aspect of the administrative remedy is alleged to cause the potential irreparable injury in this case. Relying on the Third Circuit's decision in *Yahn & McDonnell*, 787 F.2d at 134, the district court assumed that submission of a withdrawal liability dispute to arbitration automatically entailed the compelling of interim withdrawal liability payments pursuant to 29 U.S.C. § 1401(d). *See* 639 F.Supp. at 1479. That the district court so decided is understandable, for the court below was constrained to decide that question without the benefit of the PBGC's views contained in its *amicus* brief or the Seventh Circuit's decision in *Robbins v. McNicholas Transp. Co.*, 819 F.2d 682 (7th Cir.1987). The *McNicholas* court, relying, curiously enough, upon the PBGC's brief before this court, concluded "that a district court has a measure of discretion whether

or not to use injunctive power to compel interim payments in these situations." *Id.* at 685. In deciding whether an exception to the general requirement of interim payments is warranted, "the court should consider the probability of the employer's success in defeating liability before the arbitrator and the impact of the demanded interim payments on the employer and his business." *Id.*

We agree with *McNicholas*'s reasoning that a district court has some discretion in ordering interim withdrawal liability payments. We therefore conclude, contrary to the court below, that whether to compel arbitration and whether to compel interim payments are discrete questions. Since, to our knowledge, CSF has not moved to compel interim payments in this case, the question whether the district court should or should not compel such payments is not presented on this appeal. Thus, the question this appeal does present is whether the submission of the instant dispute to arbitration would, in and of itself, likely cause TIME–DC irreparable harm. We conclude that it would not.

First, because submission of the case to arbitration does not necessarily entail the ordering of interim withdrawal liability payments, there is no basis for believing that arbitration would have any direct impact upon TIME–DC's financial state. Since submission of the case to arbitration probably would not force TIME–DC to make greater expenditures than would be necessitated in the ordinary course of district court litigation, TIME–DC's precarious financial state is not relevant to the exhaustion question.

Second, we reject TIME–DC's argument that submission of this case to arbitration will undermine customer confidence in the firm and cause irreparable injury through a resulting loss of business. TIME–DC

claims that it has been able to reassure its customers only by firmly stating its intention to " 'vigorously contest this demand.' " 639 F.Supp. at 1477. TIME–DC is, however, as able to "vigorously contest" CSF's assessment in arbitration as it may before the district court. If, instead, TIME–DC's assertion is that its customers perceive arbitration as a greater threat to a company's health than district court litigation, we reject that argument as a matter of law. The mere fact that a procedure, duly enacted into law by Congress, is disfavored by a segment of the population has never been thought sufficient to relieve the federal courts of their duty to enforce the law.

For similar reasons, we reject as unfounded the district court's conclusion that "[t]here is a rational basis for TIME–DC's contention that, absent injunctive relief, other funds will not sit idly by as CSF devours TIME–DC's assets." 639 F.Supp. at 1477. As previously noted, submission of the case to arbitration does not necessarily expose any of TIME–DC's assets to CSF; submission of the dispute to the congressionally mandated procedures does not necessarily bring CSF any closer to collecting its assessment than would be the case were the dispute instead tried in district court. Thus, rational actors would view arbitration of the dispute as no more likely than litigation to signal imminent exposure of TIME–DC's assets.[7]

### III.

The order of the district court is REVERSED and this case is REMANDED for further proceedings not inconsistent with this opinion.

GARWOOD, Circuit Judge, concurring:

I join in all of Judge Randall's cogent opinion except part II A. I do not reach the question dealt with in part II A, as the

---

**7.** In an unsolicited supplemental letter brief, TIME–DC urges that the district court's decision may be affirmed by extending, by analogy, to the MPPAA the Supreme Court's decision in *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). TIME–DC did not make this argument before the district court. "We will consider an issue raised for the first time

on appeal only if the issue is purely a legal one and if consideration is necessary to avoid a miscarriage of justice." *In re Goff (Citizens Nat'l Bank v. Taylor),* 812 F.2d 931, 933 (5th Cir. 1987). As neither of these two preconditions is present in the instant case, we do not address TIME–DC's *Kyne* argument.

holding in part II B, with which I fully concur, adequately disposes of the only issue before us, whether to affirm or reverse the herein appealed temporary injunction.